**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUN 21 2004**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

TERESA ZOLTANSKI,

      Petitioner,

v.

FEDERAL AVIATION
ADMINISTRATION,

      Respondent.

No. 02-9551

**APPEAL FROM THE DECISION OF THE**
**FEDERAL AVIATION ADMINISTRATION**
**(FAA Order No. 2002-12)**

Patricia S. Bangert of Powers Phillips, P.C., Denver, Colorado, for Petitioner.

Colette G. Matzzie, Attorney, Appellate Staff, Civil Division (Robert D. McCallum, Jr., Assistant Attorney General, and Thomas M. Bondy, Attorney, Appellate Staff, Civil Division, with her on the brief), Department of Justice, Washington, D.C., for Respondent.

Before **KELLY** and **HARTZ**, Circuit Judges, and **CASSELL,** District Judge [*].

**HARTZ**, Circuit Judge.

---

[*]The Honorable Paul G. Cassell, United States District Judge for the District of Utah, sitting by designation.

Teresa Zoltanski seeks review of a $250 fine imposed by the Administrator of the Federal Aviation Administration (FAA). The Administrator assessed the fine after holding that on October 21, 1999, Zoltanski violated 14 C.F.R. § 107.20 (1999), which states, "No person may enter a sterile area [the area past the security checkpoint at an airport] without submitting to the screening of his or her person and property in accordance with the procedures being applied to control access to that area . . . ." On appeal to this court Zoltanski contends that the Administrator's findings of fact were not supported by substantial evidence and that the Administrator erroneously concluded that her conduct violated the regulation. She also raises several contentions relating to the fairness of the administrative proceedings. Exercising jurisdiction under 49 U.S.C. § 46110, we affirm.

## I.    BACKGROUND

### A. Facts

In determining the relevant facts the Administrator used as her starting point the findings in an initial decision by an Administrative Law Judge (ALJ). The following summarizes those findings, supplemented by some undisputed facts. Zoltanski, an attorney, went to Denver International Airport late in the evening of October 21, 1999, to meet an arriving passenger, the speaker at a legal-education seminar she was hosting. She wished to meet her guest at the

gate where passengers would be deplaning. At that time nonpassengers were permitted to meet passengers at a gate if they successfully passed through a security checkpoint. The FAA called the area beyond a checkpoint a "sterile area." Once inside the sterile area, Zoltanski could take an escalator to the trains that transported visitors to the various concourses and gates.

At the checkpoint Zoltanski successfully passed through the metal detector, and her purse passed through the X-ray machine without incident. As she retrieved her purse from the end of the X-ray machine's conveyor belt, Stephanee Rose, a security screener, asked Zoltanski to submit her purse for explosives-trace-detection (ETD) screening, for which she had been randomly selected. Rose was an employee of Argenbright Security, a private company operating under a contract with United Airlines, as permitted by the regulatory scheme then in effect.

Zoltanski asked how long it would take to test her purse for explosives and expressed concern that it might be damaged. Rose explained the process to her and told her that she could refuse to submit her purse for screening, but did not tell her that she would not be able to proceed to the gate if she refused.

The checkpoint screening supervisor, Harold Avila, observed the interaction between Zoltanski and Rose. He walked over to them and attempted to explain the process to Zoltanski and assure her that her purse would not be

damaged. Zoltanski insisted that she did not need to submit her purse for ETD screening because it had successfully passed through the X-ray machine. Avila told her that ETD screening was FAA policy, but did not inform her that refusal to submit would preclude her from proceeding to the gate. Zoltanski refused the ETD screening "in rather rude tones" and asked to speak to Avila's supervisor.

Avila told Zoltanski to wait, and left to get his supervisor. As he walked away, Zoltanski proceeded to the escalators leading to the train platforms. Patrick Badu, Avila's supervisor, observed Zoltanski on the escalator as he left his office. He loudly called out to her from the top of the escalator to stop and return to the security checkpoint, but she did not respond. (The ALJ concluded that this was "understandable" because Badu spoke accented English and could be difficult to understand.)

Badu approached Zoltanski on the train platform. The ALJ made inconsistent findings regarding whether Badu was identifiable as a security officer. First, the ALJ wrote, "Like Avila, [Badu] wore a maroon blazer with an airport ID badge." R., Vol. II, Doc. 35 at 4. Later in his decision, however, he wrote: "[Badu] wore a maroon jacket; identifiable security personnel wore blue. Further, he was not wearing a badge or other marking readily associating him with security." Id. at 5 (internal citation omitted). In any event, Badu told Zoltanski that she needed to have her purse screened, but did not specifically

mention explosives testing or inform her that she would need to leave the sterile area unless she submitted her purse for further screening. The ALJ found that Zoltanski could have reasonably believed that Badu was not associated with security and thus permissibly ignored this admonition. When Zoltanski insisted that she had been through screening, Badu radioed Avila to tell him to contact the police. He continued to follow Zoltanski as she boarded the train, traveled to her guest's concourse, and disembarked. Zoltanski was eventually detained by the Denver police, who released her after a search of her purse revealed nothing dangerous.

*B. Section 107.20*

In response to increasing threats of terrorism, the FAA promulgated 14 C.F.R. § 107.20 in 1986. 51 Fed. Reg. 1350, 1350 (Jan. 10, 1986). The regulation states: "No person may enter a sterile area without submitting to the screening of his or her person and property in accordance with the procedures being applied to control access to that area . . . ." 14 C.F.R. § 107.20 (1999). The regulation defines "sterile area" as "an area to which access is controlled by the inspection of persons and property in accordance with an approved security program . . . ." 14 C.F.R. § 129.25(a)(7) (1999). The "Background" section explaining the regulation contained the following:

> Nonpassengers entering a sterile area generally understand that they too must be screened in order to ensure the security of the area.

-5-

There have been instances, however, in which nonpassengers have refused to be screened and intentionally entered a sterile area. Even when these persons turn out to be unarmed and have no intention of hijacking or sabotaging an aircraft, their presence requires an appropriate security response. That need to respond disrupts the orderly conduct of passenger screening and requires the diversion of security personnel from other duties. Should another incident constituting a genuine security threat occur at the same time, the ability to respond could be seriously compromised.

51 Fed. Reg. 1350. (Section 107.20 has since been recodified at 14 C.F.R. § 108.201(c) in 2001, see 66 Fed. Reg. 37330, 37356 (July 17, 2001), and then at 49 C.F.R. § 1540.107 in 2002, following the creation of the Department of Homeland Security and the Transportation Security Administration.)

Penalties for violating the regulation are authorized by 49 U.S.C. § 46301(a)(1), which in 1999 stated: "A person is liable to the United States Government for a civil penalty of not more than $1,000 for violating [certain enumerated statutory provisions or] a regulation prescribed or order issued under any [such] provision . . . ." The FAA Administrator is authorized by 49 U.S.C. § 46301(d)(2) to impose these civil penalties.

*C. Proceedings Below*

The FAA filed a Notice of Proposed Civil Penalty proposing that Zoltanski be fined $250 for violating 14 C.F.R. § 107.20. Zoltanski requested a hearing, and the FAA filed a written complaint. Zoltanski filed an answer denying the FAA's allegations and requesting that the complaint be dismissed as frivolous.

The ALJ held a two-day evidentiary hearing at which Zoltanski, Badu, Avila, and Rose, among other witnesses, testified. After the hearing the parties filed closing briefs, and Zoltanski again moved to dismiss the complaint.

In his written decision the ALJ stated that the FAA had not proved its case. The ALJ prefaced his findings by stating that despite the conflicting accounts provided by the witnesses, "[h]aving observed [their] demeanor and listened to their testimony, I find that each believed in the truth of what he or she stated." R., Vol. II, Doc. 35, at 3. The ALJ found: "The preponderance of the reliable and probative evidence did not suggest that Zoltanski made a deliberate effort to evade screening procedures. Having successfully passed through the X-ray and magnetometer, she believed that she had been cleared to go to the arrival gate to meet her passenger." Id. at 4. In support of this finding regarding Zoltanski's subjective belief, the ALJ said: "Screening officials had explained to [Zoltanski] no more than that an ETD screening was optional. She never understood it to be mandatory, and understandably felt that she could proceed to the gates." Id. at 5. Despite finding that Avila had told Zoltanski to wait, the ALJ also found that she "[d]eni[ed] that Avila had told her to wait, [and] asserted that no one had told her that she could not continue to the trains." Id. at 3.

The ALJ appeared to find that Zoltanski's subjective belief was objectively reasonable. According to the ALJ,

While the behavior of screening personnel, particularly Badu's in calling her back and following her, might have reasonably suggested that the screening process had not yet concluded, it was also reasonable for Zoltanski to deduce that screening personnel were mistaken or confused because (in her mind) she had actually cleared.

Id. at 5. The ALJ concluded that on the evidence before him he could not find that "Zoltanski knew or should have known that she had not submitted to the entire screening process in effect at the checkpoint after passing through the X-ray and magnetometer without incident." Id.

The FAA appealed the ALJ's decision to the Administrator, contending that the ALJ had erred in concluding that Zoltanski's conduct did not violate the regulation. (Zoltanski cross-appealed, but her appeal was dismissed after she failed to file a supporting brief.) The FAA argued that "[t]he ALJ improperly found that [Zoltanski] had no reason to know that she was required to undergo ETD screening" because "[u]nderstood in its proper context, [Avila's] testimony provide[d] ample basis for a reasonable person to be on notice of the procedures involved in ETD screening." R., Vol. II, Doc. 39, at 15. The FAA objected to the ALJ's failure to attach "any apparent significance to his express finding that Mr. Avila told [Zoltanski] to 'wait' while he consulted Mr. Badu regarding [Zoltanski's] recalcitrance to undergo ETD screening," id., at 20, characterizing it as one of several errors that were "debilitating to [the ALJ's] conclusion that

[Zoltanski] did not have reason to suspect that she was subject to mandatory ETD screening before being allowed access to the sterile area," id., at 21.

The FAA also contended that the ALJ had given improper weight to Zoltanski's testimony, because his "conclusion that [Zoltanski] 'neither knew nor had reason to know that she might be, or in fact was, required to undergo a second layer of screening in order to meet her passenger' does not comport with the testimony of Ms. Rose, and Messrs. Avila and Badu." Id. at 23. According to the FAA, "The record . . . reveal[ed] that the weight of the evidence support[ed] the conclusion that [Zoltanski] knew, or should have known, that she was required to submit her purse for ETD screening . . . ." Id. In the FAA's view, once the ALJ had found the testimony of all witnesses credible, the weight of the credible evidence supported a finding that Zoltanski had violated the regulation.

Zoltanski countered that she did not violate § 107.20, and that even if she did, her violation was unknowing and could not be punished. She argued that she lacked notice that ETD screening was a required secondary procedure because none of the security personnel informed her that it was mandatory and that she would have to leave the sterile area if she refused to submit to it. According to Zoltanski, "The Administrative Law Judge found, and the regulatory history of 14 C.F.R. § 107.20 indicates that the Agency did not intend the regulation to be a strict liability rule and thus, unknowing violations cannot be prosecuted." R., Vol

II, Doc. 40, at 13. She also contended that "mandatory ETD secondary testing was not being applied the night of October 21, 1999," id. at 21 (emphasis deleted), and that the ALJ correctly weighed the witnesses' testimony and reached the correct ultimate conclusion.

The Administrator reversed the ALJ's decision. Focusing on whether Zoltanski's alleged subjective belief was objectively reasonable, the Administrator ruled:

> The ALJ erred in holding that it was reasonable for Zoltanski to conclude that the screening process was over and that she was free to proceed to the gates. In light of the ALJ's factual findings, Zoltanski should have known that security personnel were not satisfied that she had completed screening.

R., Vol. II, Doc. 42, at 8. Noting that the ALJ had found that Avila had informed Zoltanski that the ETD screening was FAA policy, and had told her to wait when he went to get his supervisor, the Administrator reasoned that although "[t]he ALJ wrote in his decision that no one specifically communicated to Zoltanski that she could not proceed to the gates[,] . . . [g]iven that Zoltanski had been told to wait, . . . what is more important is that no one told her to proceed." Id. at 10. The Administrator also disagreed with the ALJ's finding that Zoltanski could reasonably have concluded, given the circumstances, that Badu was not associated with security when he told her that she needed to have her purse screened. The Administrator concluded that "the preponderance of the evidence as recited by the

ALJ himself indicates that [the FAA] successfully bore its burden of establishing that Zoltanski violated Section 107.20," id. at 12, and fined Zoltanski $250.

## II.     DISCUSSION

Before applying the law to the specific facts of this case, we address the scienter required for a violation of § 107.20 and then our standard of review.

*A. Scienter*

No scienter requirement appears in 14 C.F.R. § 107.20 (1999) or the penalty provision, 49 U.S.C. § 46301(a). Section 107.20 states merely, "No person may enter a sterile area without submitting to the screening of his or her person and property in accordance with the procedures being applied to control access to that area . . . ." And 49 U.S.C. § 46301(a)(1) stated in 1999: "A person is liable to the United States Government for a civil penalty of not more than $1,000 for violating" the regulation.

Thus, on the face of the regulation and penalty provision, it appears that an airport patron could be fined even if she had no idea that she was violating airport security procedures, or even if a reasonable person in her circumstances would not have known that she was doing so. Nevertheless, we assume without deciding that a person is subject to a fine for improperly entering a sterile area only if she did not reasonably believe that she had complied with required security screening. In this case the FAA (contrary to Zoltanski's contention in her brief) has

consistently advanced in this litigation that interpretation of the regulation. And Zoltanski, although arguing that she cannot be fined if she bore no fault, concedes in her reply brief that she "has never contended that she could escape liability if she had an unreasonable, subjective belief that she had completed screening." Reply Br. at 23.

Zoltanski has not argued on appeal that she in fact complied with required security procedures. Nor has the FAA challenged the ALJ's finding that Zoltanski actually believed that she had complied with security requirements. This appeal therefore turns on whether the Administrator could properly find that it was unreasonable for Zoltanski to believe that she had completed security procedures when she entered a sterile area.

*B. Standard of Review*

Zoltanski contends that the Administrator's finding that she "violated Section 107.20 because she failed to wait at the checkpoint is contrary to the evidence, and the record as a whole." Aplt. Br. at 34-35. In particular, she argues that the Administrator failed to afford proper deference to the ALJ's findings of fact and credibility determinations.

On appeal, however, we review the factual findings of the Administrator, not those of the ALJ, and the Administrator's findings are conclusive if they are supported by substantial evidence. See 49 U.S.C. § 46110(c) ("Findings of fact

by the Secretary, Under Secretary, or Administrator, if supported by substantial evidence, are conclusive.").  Our review under this standard is "quite narrow." U.S. Cellular Tel., L.L.C. v. City of Broken Arrow, Oklahoma, 340 F.3d 1122, 1133 (10th Cir. 2003).

> Substantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the decisionmaker.  Substantial evidence requires more than a scintilla but less than a preponderance.  The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence.

Id. (internal quotation marks, citation, and brackets omitted).  Thus, we may not "displace the agenc[y's] choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo."  Custer County Action Ass'n v. Garvey, 256 F.3d 1024, 1030 (10th Cir. 2001) (internal quotation marks omitted).

Although the ALJ's findings are an important part of the record, they are not dispositive.  The applicable statute states:  "In an appeal from a decision of an administrative law judge as the result of a hearing . . . the Administrator shall consider only whether—(i) each finding of fact is supported by a preponderance of reliable, probative, and substantial evidence; . . . ."  49 U.S.C. § 46301(d)(7)(B).  Accordingly, the Administrator must weigh the evidence to

determine whether a preponderance supports a finding by the ALJ.  As we have stated in a similar context:

> The Commission must consider the initial decision of the Law Judge and the evidence in the record on which it was based.  But the findings and conclusions of the Law Judge are not sacrosanct and are not necessarily binding on the Commission or the court; they are part of the record to be considered on appeal.

Adolph Coors Co. v. FTC, 497 F.2d 1178, 1184 (10th Cir. 1974) (internal citation omitted).  Our review of the Administrator's rejection of a finding of fact by the ALJ depends on the type of factual finding:

> If the Board rejects the ALJ's findings concerning credibility of witnesses or evidence, the Board must have substantial justification apparent from the record; however, if it has merely drawn inferences from the established facts contrary to those of the ALJ, . . . the Board's rejection of the ALJ's conclusions is less significant.

Nephi Rubber Prods. v. NLRB, 976 F.2d 1361, 1364 (10th Cir. 1992); see also Richard J. Pierce, Jr., 2 Administrative Law Treatise §11.2, at 778 (4th ed. 2002) ("The ALJ's finding is only a part of the record to be considered by a reviewing court in determining whether the agency's finding is supported by substantial evidence in the record as a whole.  A finding by an ALJ is particularly influential with a reviewing court, however, when the finding is a primary or testimonial inference that is based largely on the demeanor of witnesses . . . .").

This view of the role of the ALJ has been embraced by the FAA.  Although the Administrator is "permitted to reweigh the evidence" found by the ALJ, In the

Matter of Ronald C. Terry, FAA Order No. 91-31, at *1 (Aug. 2, 1991), the FAA recognizes that "[an administrative] law judge is in the best position to observe the demeanor of witnesses at a hearing, and, as a result, the [ALJ]'s credibility findings deserve special deference." In the Matter of Nicholas J. Werle, FAA Order No. 97-20, at *5 (May 23, 1997).

### C. Propriety of the Administrator's Ruling

We now turn to the particulars of the appeal before us. Zoltanski contends that various of the Administrator's findings of fact are not supported by substantial evidence and that the Administrator erred in concluding that Zoltanski violated 14 C.F.R. § 107.20. There is no dispute, however, regarding most of the historical facts relating to the airport incident. And the propriety of the Administrator's ruling turns only on whether she could find that it was unreasonable for Zoltanski to believe that she had completed security screening. Our discussion can therefore be relatively brief.

The controversy centers on Zoltanski's responses to Avila and Badu. The Administrator found that (1) Avila told Zoltanski to wait at the checkpoint while he got his supervisor, and (2) Badu, wearing a security officer's coat and an identification badge, told Zoltanski as she stood on the train platform that she needed to have her purse screened. Each of these findings was supported by

substantial evidence and we see no reason to refuse to defer to either finding. We discuss each in turn.

As for the first finding, Avila testified, "I told her to wait, and she just said she wanted to talk to my supervisor." R., Vol. I, Doc. 15, at 90. Later he explained, "I was like not even like a foot away from her, and I told her to wait while I go get my other supervisor." R., Vol. II, Doc. 29, at 283. Such testimony based on personal knowledge constitutes quintessential substantial evidence. Moreover, the ALJ credited this testimony, finding that Zoltanski "asked to speak to Avila's supervisor. . . . Avila told her to wait." R., Vol. II, Doc. 35, at 3 (internal citations omitted).

The only possible basis for challenging the Administrator's finding is that the ALJ apparently also made a finding contrary to Avila's testimony. The ALJ's decision seems to say that Avila did not tell Zoltanski to wait. See id. ("Denying that Avila had told her to wait, [Zoltanski] asserted that no one had told her that she could not continue to the trains.") Perhaps the ALJ's two findings could be reconciled by saying that Avila told Zoltanski to wait but she did not hear him. It is unclear, however, how that could be the case. Avila testified that he was only a foot away from Zoltanski when he spoke to her, and the ALJ found that checkpoint traffic was light at the time. If Avila told her to wait, she must have heard him or intentionally avoided hearing him.

-16-

Had the ALJ not believed Avila, the matter would be rather different.  But the ALJ made no adverse credibility findings, even saying that each witness "believed in the truth of what he or she stated." Id.  When the ALJ makes such hard-to-reconcile findings without making any effort to explain how they can be reconciled, the Administrator need not defer to one finding over the other but can draw her own reasonable inferences from the record.  We therefore affirm the Administrator's finding that Avila told Zoltanski to wait.

The Administrator's other critical finding—that Badu, clearly identified as a security officer, told Zoltanski that she needed to have her purse screened—is also supported by first-hand testimony and is undercut only by an ALJ finding that contradicts another one of his findings supporting the Administrator's finding.  According to Badu's testimony, when he came out of his office and saw Zoltanski "descending down the escalator to the train station," he:

> followed her, and . . . asked her to come back so that we could finish screening her bag.  She kept on descending.  As she went down to the train station, I went down there and told her, Ma'am, please, we need to screen your bag.  This is an FAA requirement.  You can't board the train.

R., Vol. I, Doc. 15, at 99.

Zoltanski contends that Badu was not identifiable as a security officer.  She argues that the Administrator improperly rejected the ALJ's findings that Badu's jacket was a different color from that of other airport security personnel and that

-17-

he was not wearing a badge. To be sure, the ALJ made these findings, but he also found that Badu was wearing a badge and the same maroon blazer as Avila. It would have been impossible for the Administrator to defer to both of the contradictory findings by the ALJ. The Administrator's finding was supported by the record and must be affirmed.

We further hold that the Administrator's findings of historical fact support her determination that Zoltanski could not have reasonably believed that she had completed the screening process. After all, (1) Zoltanski was asked to submit her purse for ETD screening; (2) she was told that ETD screening was FAA policy; (3) she objected to ETD screening and asked to speak to a supervisor; (4) she departed the screening area without waiting (even briefly) for the supervisor and even though Avila told her to wait; and (5) when Badu, who was wearing an identification badge and the same maroon jacket as Avila, caught up to her on the train platform and said her purse needed to be screened, she responded that she had been through screening. Disagreeing with the ALJ as to the import of "no one specifically communicat[ing] to Zoltanski that she could not proceed to the gates," the Administrator observed, "Given that Zoltanski had been told to wait, . . . what is more important is that no one told her that she could proceed." R., Vol. II, Doc. 42, at 10. The Administrator also reasoned that in light of Zoltanski's interactions with checkpoint personnel, "it was not reasonable for

-18-

Zoltanski to conclude that the man who approached her on the train platform (Shift Supervisor Badu) was not associated with security. As a result, she should have stopped and waited until the matter was resolved." Id. at 11. The Administrator concluded that "Zoltanski should have known that security personnel were not satisfied that she had completed screening." Id. at 8. This is a reasonable view of the evidence.

Zoltanski complains that the Administrator should have deferred to the ALJ's view regarding what it was reasonable for Zoltanski to think. We disagree. As we have written in a similar context, "[I]n cases in which the ALJ and the Board reach contrary conclusions, we determine whether the Board sufficiently articulated reasons for rejecting the ALJ's findings or conclusions." Grubb v. FDIC, 34 F.3d 956, 961 (10th Cir. 1994). "If the Board . . . has merely drawn inferences from the established facts contrary to those of the ALJ, . . . the Board's rejection of the ALJ's conclusions is less significant." Nephi Rubber Prods., 976 F.2d at 1364. The Administrator need not defer to the ALJ in deciding whether a person's conduct was objectively reasonable in light of specified facts. The ALJ's observation of the witnesses during their testimony offers no advantage in resolving the issue because it does not turn on credibility or any other feature of the particular people involved in the incident—the task is to decide what a "reasonable person" would think or do.

The record and common sense support the Administrator's finding. Accordingly, we uphold the Administrator's ruling that Zoltanski violated the regulation.

*D. Additional Contentions By Zoltanski*

We quickly dispose of Zoltanski's additional arguments for reversal. First, she contends that the Administrator changed the elements of a § 107.20 violation from those argued by the FAA before the ALJ and the Administrator. We reject this contention because throughout this litigation the FAA has consistently adopted the position that the test is whether a reasonable person would have thought that she had cleared security. Second, she contends that the Administrator actually found her in violation of 49 C.F.R. 1540.109, which was promulgated in 2002 and thus not in effect on October 21, 1999. This argument has no basis in the record, and we reject it.

Next, Zoltanski contends that the Administrator denied her due process by interpreting § 107.20 to prohibit "*any failure* to obey *any instruction* by a private security employee," an unconstitutionally vague standard under which a person "of common intelligence must necessarily guess at its meaning." Aplt. Br. at 39-40 (internal quotation marks omitted). This argument is without merit because the Administrator did not adopt that interpretation. The actual interpretation restricts coverage of § 107.20 to individuals who should reasonably know that

-20-

their conduct is in contravention of the airport's security requirements. Zoltanski conceded the permissibility of such an interpretation in her reply brief.

## III.  CONCLUSION

We AFFIRM the Administrator's decision and order holding Zoltanski liable for violating 14 C.F.R. § 107.20 and fining her $250.  The parties' motions to file their briefs under seal is GRANTED.  The FAA's motion to file the administrative record under seal is GRANTED.