**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**February 13, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

DAVID W. HALL,

        Petitioner,

        v.

UNITED STATES DEPARTMENT OF
LABOR, ADMINISTRATIVE REVIEW
BOARD,

        Respondent.

No. 05-9512

---

**PETITION FOR REVIEW OF AN ORDER FROM THE UNITED STATES**
**DEPARTMENT OF LABOR ADMINISTRATIVE REVIEW BOARD**
**(Agency Docket No. 02-108)**

---

Mick G. Harrison, Berea, Kentucky, appearing for Petitioner.

Ian H. Eliasoph, Attorney (Howard M. Radzely, Solicitor of Labor, Steven J. Mandel, Associate Solicitor, and Paul L. Frieden, Counsel for Appellate Litigation, with him on the brief), United States Department of Labor, Washington, D.C., appearing for Respondent.

---

Before **TACHA**, Chief Circuit Judge, **McKAY** and **HENRY**, Circuit Judges.

---

**TACHA**, Chief Circuit Judge.

---

Petitioner-Appellant Dr. David W. Hall, a civilian chemist for the United States Army Dugway Proving Ground ("Dugway" or "Army"), filed a complaint with the United States Department of Labor on February 13, 1997, alleging violations of the employee protection provisions of several environmental statutes, which protect employees from being discriminated against for engaging in specified protected activity.[1] After investigating the allegations, on April 17, 1997, the Occupational Safety and Health Administration ("OSHA") determined that there was no merit to Dr. Hall's complaint. Dr. Hall requested a hearing before an Administrative Law Judge ("ALJ"), and effective June 12, 1997, he resigned his position at Dugway.

On August 8, 2002, following an exhaustive 57-day hearing, the ALJ issued a Recommended Decision and Order ("RD&O") finding that Dr. Hall's resignation was a constructive discharge due to a hostile work environment created by Dugway in retaliation for Dr. Hall's protected activities under the environmental statutes. Dugway petitioned the Administrative Review Board ("ARB" or "Board") for a review of the ALJ's RD&O. The ARB rejected the ALJ's conclusion, finding that Dr. Hall failed to prove Dugway acted with retaliatory motive in any of the alleged hostile acts taken

---

[1] Dr. Hall alleged violations of the whistleblower provisions of various environmental statutes, including the Solid Waste Disposal Act, 42 U.S.C. § 6971(a) ("SWDA"), the Clean Air Act, 42 U.S.C. § 7622(a); the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9610(a); the Federal Water Pollution Control Act, 33 U.S.C. § 1367(a); the Safe Drinking Water Act, 42 U.S.C. § 300j-9(i)(1).

against him.  Dr. Hall now asks this court to review the ARB's ruling.  We exercise jurisdiction to review the Secretary of Labor's final ruling pursuant to 42 U.S.C. § 6971(b) and AFFIRM.

## I.  BACKGROUND

Dr. Hall worked as a civilian chemist in the Chemical Laboratory Division ("Chem Lab") at Dugway, a munitions test and evaluation range, from 1986 through June 1997.  His position as a chemist with access to hazardous chemicals required him to have a valid security clearance.  Between 1987 and 1997, Dr. Hall reported several perceived environmental and safety hazards to federal and state agencies, some of which resulted in investigations of and enforcement actions against Dugway.

On February 13, 1997, Dr. Hall filed a complaint with the United States Department of Labor alleging Dugway violated the employee protection provisions of several environmental statutes.  Dr. Hall alleged that after he reported environmental and safety concerns to the Army and outside agencies, Dugway retaliated by creating a hostile work environment.  For example, he alleged that the Army retaliated against him by reinvestigating and recommending revocation of his security clearance, requiring him to undergo unnecessary mental health and fitness-for-duty exams, subjecting him to hostile comments and policies in the workplace, unfairly lowering his performance evaluations and threatening disciplinary action against him, and interfering with his work in an effort to stymie completion of his assignments.

Upon the initial filing of Dr. Hall's complaint, OSHA investigated and concluded that it had no merit. Dr. Hall then requested a hearing before an ALJ. He retired effective June 12, 1997, prior to the hearing; consequently, the ALJ construed Dr. Hall's original complaint of retaliation to include a claim that he was constructively discharged. In a lengthy RD&O, the ALJ concluded that Dr. Hall had engaged in protected activity, and that Dugway had indeed retaliated against Dr. Hall because of his protected activities, in violation of the environmental statutes. The ALJ's recommended order awarded substantial damages and attorney's fees to Dr. Hall.

Dugway challenged the ALJ's recommended order, and the case was submitted for review to the ARB. *See* 29 C.F.R. § 24.8 (explaining that the ARB "has been delegated the authority to act for the Secretary [of Labor] and issue final decisions" as to such discrimination claims). In its Final Decision and Order, issued in December 2004, the ARB rejected the ALJ's recommendations and dismissed Dr. Hall's complaint, finding (1) under *Department of the Navy v. Egan*, 484 U.S. 518 (1988), it had no authority to review the merits of Dugway's reinvestigation and revocation of Dr. Hall's security clearance; and (2) with respect to the remaining hostile actions alleged, Dr. Hall failed in his burden to prove retaliatory motive.

On appeal, Dr. Hall argues that: (1) the ARB abused its discretion by misconstruing *Egan* and failing to review the Army's security clearance decisions; (2) the ARB's decision is not supported by substantial evidence because the ARB improperly

evaluated direct and circumstantial evidence of retaliatory motive; and (3) the ARB abused its discretion by misconstruing Dr. Hall's complaint and the law of constructive discharge.

## II. DISCUSSION

We review the ARB's decision under the standard established by the Administrative Procedure Act, 5 U.S.C. §§ 701–06. *See Anderson v. U.S. Dep't of Labor*, 422 F.3d 1155, 1173 (10th Cir. 2005). Thus, the Court will reverse the Final Order only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). We review the factual findings of the Board, not those of the ALJ, and the Board's findings are conclusive if they are supported by "substantial evidence." *See id.* § 706(2)(E); *Zoltanski v. F.A.A.*, 372 F.3d 1195, 1200 (10th Cir. 2004). Our review under this "substantial evidence" standard is "quite narrow." *Zoltanski*, 372 F.3d at 1200. We review questions of law de novo. *See Anderson*, 422 F.3d at 1173.

The various environmental statutes Dr. Hall alleges Dugway to have violated contain employee protection provisions that prohibit an employer from discharging or discriminating against an employee for reporting environmental violations. *See, e.g.*, 42 U.S.C. § 6971(a) (SWDA's employee protection provision); *see also* 29 C.F.R. § 24.2(a) (providing for implementation of the employee protection provisions of the SWDA and

other environmental statutes).[2]  "To state a claim under the whistleblower provision of an environmental statute, the plaintiff must establish that his employer retaliated against him because he engaged in a protected activity."  *Sasse v. U.S. Dep't of Labor*, 409 F.3d 773, 779 (6th Cir. 2005).  Specifically, Dr. Hall must show: (1) he was an employee; (2) he engaged in protected activity; (3) Dugway knew of the protected conduct; (4) the alleged discrimination occurred—that is, the alleged hostile acts occurred; and (5) a nexus exists making it likely that the protected activity led to the alleged discrimination.  *See Anderson*, 422 F.3d at 1178.  The plaintiff bears the burden of proving discrimination. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000).

Dr. Hall alleges that Dugway created a hostile work environment in retaliation for his environmental reporting activities that ultimately led to his constructive discharge. The ARB found, and the parties do not contest, that Dr. Hall engaged in protected activity and that Dugway was aware of his activities.  On appeal, the only challenge concerns the ARB's conclusion that there was no nexus between Dr. Hall's protected activity and Dugway's allegedly hostile acts.  An employer creates a hostile work environment when "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Davis v. U.S. Postal*

---

[2]The ARB found Dr. Hall alleged violations under the SWDA and consequently did not examine the remaining statutes.

*Serv.*, 142 F.3d 1334, 1341 (10th Cir.1998) (quotations omitted) (hostile work environment claim brought under Title VII). A constructive discharge claim based on a hostile work environment goes a step farther. An employee is constructively discharged when the employer by his illegal discriminatory acts makes "working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign." *Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 534 (10th Cir. 1998) (quotation omitted) (discrimination and retaliation action brought under Age Discrimination in Employment Act and Title VII). Thus, a constructive discharge "can be regarded as an aggravated case of . . . hostile work environment." *Pa. State Police v. Suders*, 542 U.S. 129, 146 (2004). In either case, the plaintiff must show that he was targeted for harassment *because of* his protected activity. *See Sasse*, 409 F.3d at 779.[3] That is, there must be evidence that justifies "an inference of retaliatory motive" for Dugway's allegedly hostile actions. *Burrus v. United Tel. Co. of Kan.*, 683 F.2d 339, 343 (10th Cir. 1982).

A.    Authority to Review Security Clearance Decisions

Dr. Hall contends that Dugway retaliated against him by reinvestigating, suspending, and recommending revocation of his security clearance. The ARB declined

---

[3]On appeal, Dr. Hall does not separately press a claim for being subjected to a hostile work environment. He alleges only that because of the hostility at Dugway, he was constructively discharged. Because we affirm the Board's determination that Dr. Hall failed to establish that the alleged hostility was connected to his protected activity, any hostile work environment claim Dr. Hall could have pressed would likewise fail.

to review these actions because it concluded that it lacked authority to do so.  We agree with the Board that it lacked authority to review the Army's determinations regarding Dr. Hall's security clearance.

As the Supreme Court explained in *Egan*, security clearance decisions are made pursuant to constitutional authority vested in the Executive Branch.  *Egan*, 484 U.S. at 527.  Allowing an individual access to national secrets involves a "sensitive and inherently discretionary judgment call . . . committed by law to the appropriate agency of the Executive Branch." *Id.*  This discretion stems from the President's role as the Commander-in-Chief; executive authority to "classify and control access to information bearing on national security and to determine whether an individual is sufficiently trustworthy" to access secured information "flows primarily from this constitutional investment of power in the President." *Id.*  Because a determination to grant or revoke a clearance is based on a prediction of an individual's potential to compromise sensitive information, it is "not reasonably possible for an outside nonexpert body to review the substance of such a judgment and to decide whether the agency should have been able to make the necessary affirmative prediction with confidence." *Id.* at 529; *see also Hill v. Dep't of Air Force*, 844 F.2d 1407, 1411 (10th Cir. 1988) (explaining that the substance of security clearance judgments includes both the "merits and motives" of the executive decision and the "nexus between those decisions and national security interests"). Ultimately, therefore, because of both the executive's constitutional supremacy and

expertise in this area and outside authorities' lack of competence to evaluate these decisions, neither agencies nor courts have authority to review the merits of the denial of a security clearance absent a clear statutory directive from Congress. *Id.* at 529–30 (holding Merit Systems Protection Board has no statutory authority to review the Navy's substantive decision to revoke a civilian employee's security clearance); *see also Beattie v. Boeing Co.*, 43 F.3d 559, 565 (10th Cir. 1994) (stating that *Egan*'s application to the Merit Systems Protection Board of the rule that security-clearance decisions are the province of the Executive Branch also applies to federal courts).

The Army's investigation, suspension, and recommended revocation of Dr. Hall's security clearance were all taken pursuant to this unique executive authority. Determining whether there was a retaliatory motive behind the challenged actions would have required the Board to examine the legitimacy of the Army's proffered reasons and the merits of the revocation decision. Because *Egan* held that such scrutiny is an impermissible intrusion by a non-expert body into the authority of the Executive Branch over matters of national security, we agree with the ARB's conclusion that Dr. Hall's claim of retaliatory revocation of his security clearance is unreviewable.

Dr. Hall argues, however, that the holding in *Egan* is confined to the specific statutory scheme at issue in that case—the authority granted to the Merit Systems Protection Board under the Civil Service Reform Act, 5 U.S.C. § 1201 *et seq.*—and that because he brought his claim under the employee protection provisions of various

environmental statutes, *Egan* is not controlling. We disagree. Notwithstanding the factual incongruity, the principles underlying *Egan* are equally applicable here. The whistleblower protection laws passed by Congress do not alter the constitutional order, recognized in *Egan*, that gives the Executive Branch the responsibility to make national security determinations. Because of the discretionary nature of the decision to withhold a security clearance and the constitutional delegation of the obligation to protect national security to the Executive Branch, the Board may inject itself into the sensitive issue of security clearance review only where Congress expressly grants it authority to do so. *See Becerra v. Dalton*, 94 F.3d 145, 149 (4th Cir. 1996) (holding that "unless Congress *specifically* has provided otherwise," courts may not subject the Navy's decision to revoke a plaintiff's security clearance to judicial scrutiny). The environmental statutes upon which Dr. Hall bases his claim do not provide this authority.

Dr. Hall also seeks to distinguish *Egan* by suggesting that we need not review the merits of the Army's ultimate revocation decision, as the petitioner requested in *Egan*. Rather, he argues that we need only consider the security clearance decisions to determine whether they constitute evidence of retaliatory motive or that they contributed to Dr. Hall's constructive discharge. Dr. Hall argues for a distinction without a difference. To review the circumstances under which the Army recommended revocation of Dr. Hall's security clearance for evidence of retaliation is to review the basis of the determination itself, regardless of how the issue is characterized. The inquiry

"goes to the very heart of the 'protection of classified information [that] must be committed to the broad discretion of the agency responsible.'" *Becerra*, 94 F.3d at 149 (quoting *Egan*, 484 U.S. at 529) (alteration in original) (declining to review the reasons why the Navy instigated an investigation into the plaintiff's security clearance). This is precisely what *Egan* prohibits. *See Hill*, 844 F.2d at 1411 (explaining that *Egan* prohibits review of "merits and motives" of agency decisions relating to clearance decisions). Indeed, other courts have consistently applied *Egan* to cases involving antidiscrimination legislation similar to the environmental whistleblower protections at issue here for the same reasons. *See Hill v. White*, 321 F.3d 1334, 1335–36 (11th Cir. 2003) (discrimination action brought under Title VII and Rehabilitation Act); *Hesse v. Dep't of State*, 217 F.3d 1372, 1377 (Fed. Cir. 2000) (whistleblower discrimination brought under Civil Service Reform Act); *Weber v. United States*, 209 F.3d 756, 759–60 (D.C. Cir. 2000) (whistleblower discrimination brought under Civil Service Reform Act); *Perez v. F.B.I.*, 71 F.3d 513, 514 (5th Cir. 1995) (retaliation brought under Title VII); *Brazil v. U.S. Dep't of Navy*, 66 F.3d 193, 196 (9th Cir. 1995) (race discrimination brought under Title VII ); *Becerra*, 94 F.3d at 149 (national origin discrimination brought under Title VII ); *Guillot v. Garrett*, 970 F.2d 1320, 1324–26 (4th Cir. 1992) (disability discrimination brought under Rehabilitation Act). In each case, the court held that absent express statutory authority to review security clearance decisions, it would violate the principles of *Egan* to review the employee's claim that the security clearance

process or decision was discriminatory or retaliatory.

Finally, Dr. Hall asserts that the ARB erred in failing to recognize that it has the power to review the agency's decision for compliance with procedural requirements. It is true that courts are not precluded from reviewing a claim that an agency violated statutory or regulatory procedures when revoking or denying a security clearance. *See Duane v. U.S. Dep't of Defense*, 275 F.3d 988, 993 (10th Cir. 2002); *Hill*, 844 F.2d at 1412. To this end, Dr. Hall argues that procedural deficiencies in Dugway's decision-making process give rise to an inference of retaliation. This argument fails for two reasons. First, Dr. Hall makes no clear, substantiated allegation, nor provides any relevant record citations, indicating that the Army failed to follow its own procedural rules in revoking the security clearance. Furthermore, even if he did, what Dr. Hall essentially asks this Court to do is precisely what *Egan* makes clear is prohibited: to probe the legitimacy of the Army's motives to reach an outcome on the merits of Dugway's decision.

B.      Substantial Evidence Supports the ARB's Resolution of Dr. Hall's Constructive Discharge Claim

Dr. Hall contends that the ARB failed to properly evaluate purported direct and circumstantial evidence of retaliation. As noted, we review the factual findings of the Board, not those of the ALJ, and the Board's findings are conclusive if they are supported by "substantial evidence." *See* 5 U.S.C. § 706(2)(E); *Zoltanski*, 372 F.3d at

1200. "Substantial evidence is such relevant evidence a reasonable person would deem adequate to support the ultimate conclusion." *Grubb v. F.D.I.C.*, 34 F.3d 956, 961 (10th Cir. 1994). This standard requires more than a scintilla but less than a preponderance of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent the Board's findings from being supported by substantial evidence. *Zoltanski*, 372 F.3d at 1200. In determining whether the Board's decision is supported by substantial evidence, the court must also consider that evidence which fairly detracts from the Board's decision. *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951). This includes the ALJ's evaluation of witness credibility. Where "the Board rejects the ALJ's findings concerning credibility of witnesses . . . the Board must have substantial justification apparent from the record." *Zoltanski*, 372 F.3d at 1201 (quoting *Nephi Rubber Prods. Corp. v. N.L.R.B.*, 976 F.2d 1361, 1364 (10th Cir. 1992)). More specifically, when the Board disagrees with the ALJ's assessment of witnesses' credibility, the Board "should fully articulate [its] reasons for so doing, and then, with heightened scrutiny, we must decide whether such reasons find support in the record." *Aylett v. Sec'y of Hous. and Urban Dev.*, 54 F.3d 1560, 1561 (10th Cir. 1995) (quoting *Fierro v. Bowen*, 798 F.2d 1351, 1355 (10th Cir. 1986)). Also, we will reject the ARB's finding if it rests "*solely* on testimony discredited by the ALJ." *Pogue v. U.S. Dep't of Labor*, 940 F.2d 1287, 1289 (9th Cir. 1991) (emphasis added).

1.    *Direct Evidence of Retaliatory Motive*

-13-

Dr. Hall contends that he presented direct evidence of retaliation against him and that the Board's final decision must be reversed because it consequently failed to shift the burden of proof to Dugway.[4] Our review of the record reveals that Dr. Hall did not, in fact, present direct evidence of retaliation, and therefore, the ARB did not err in failing to shift the burden of proof.

"Direct evidence is evidence, which if believed, proves the existence of a fact in issue without inference or presumption." *Shorter v. ICG Holdings, Inc.*, 188 F.3d 1204, 1207 (10th Cir. 1999) (alterations and quotations omitted), *overruled on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003). Direct evidence requires "proof of an existing policy which itself constitutes discrimination," *Tomsic v. State Farm Mut. Auto. Ins. Co.*, 85 F.3d 1472, 1477 (10th Cir. 1996) (quotations omitted), or "oral or written statements on the part of a defendant showing a discriminatory motivation," *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1225 (10th Cir. 2000). "A statement that can plausibly be interpreted two different ways—one discriminatory and the other benign—does not directly reflect illegal animus, and, thus, does not constitute direct evidence." *Patten v. Wal-Mart Stores East, Inc.*, 300 F.3d 21, 25 (1st Cir. 2002)

[4]Once a plaintiff established that retaliation played a motivating part in the defendant's actions against him, it becomes the defendant's burden to prove by a preponderance of the evidence that "it *would* have made the same decision notwithstanding its retaliatory motive." *Medlock v. Ortho Biotech, Inc.*, 164 F.3d 545, 550 (10th Cir. 1999) (quotation omitted); *see also Price Waterhouse v. Hopkins*, 490 U.S. 228, 258 (1989).

-14-

(quotation omitted). Statements of personal opinion, even when reflecting personal bias or prejudice, do not constitute direct evidence of discrimination, but at most, are only circumstantial evidence of discrimination because the trier of fact must infer discriminatory intent from such statements. *See Shorter*, 188 F.3d at 1207.

None of the statements Dr. Hall offers as direct evidence of retaliatory motive can be so characterized. First, Dr. Hall claims that in a January 1996 meeting, Dugway Test Center Commander, Lieutenant Colonel William Kiskowski, told Dr. Hall that General George Akin, the Commanding General at the Army Test and Evaluation Command in Aberdeen, Maryland, had called Dr. Hall a "traitor" in 1990 for reporting environmental violations. Dr. Hall claims that this statement is direct evidence of discrimination. In fact, the ARB concluded—contrary to the ALJ—that Dr. Hall failed to prove that Lieutenant Colonel Kiskowski made this statement at all. The ALJ had determined that Lieutenant Colonel Kiskowski made this statement based only on Dr. Hall's testimony and a "similarly blatant statement" that General Akin allegedly published in a Dugway newsletter in which the General said he had a "deep concern with employees who reported concerns . . . outside the chain of command." The ALJ also concluded that Lieutenant Colonel Kiskowski, who testified that he never made such a statement, was not credible. The ARB rejected this credibility determination for several reasons: (1) Jerry Steelman, Dr. Hall's supervisor at the time, and a witness who attended the January 1996 meeting, testified that he did not remember Lieutenant Colonel Kiskowski making

this comment to Dr. Hall; (2) the record contains a note from Dr. Hall after the January 1996 meeting expressing positive feelings about the meeting; (3) Lieutenant Colonel Kiskowski testified that the meeting was productive; (4) the record contains a note from Lieutenant Colonel Kiskowski to Dr. Hall, written immediately after the meeting, indicating that the meeting was productive; and (5) the absence in the record of the Dugway newsletter in which General Akin allegedly expressed his concern that employees were reporting environmental issues outside the chain of command.  It therefore concluded that Dr. Hall failed to prove that he was called a traitor.  The ARB adequately stated its reasons for rejecting the ALJ's credibility determinations as to this claim, and its conclusions find substantial support in the record.  The ARB went on to find that even if the statement was made, there was no evidence to suggest that Dr. Hall subjectively perceived the comment as "hostile," and there is substantial evidence to support this conclusion.  *See Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998) (stating that the "objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.").

Second, in the same January 1996 meeting discussed above, which was convened after Dr. Hall reported safety concerns directly to the Department of Defense, Lieutenant Colonel Kiskowski allegedly issued Dr. Hall a chain-of-command "gag order" requiring Dr. Hall to report his environmental and safety concerns internally through the chain of

command as opposed to outside agencies. Specifically, Dr. Hall alleges that Lieutenant Colonel Kiskowski "told me I shouldn't even talk to [Dugway's counsel] without clearing it with him." This is not direct evidence of retaliation. Even assuming that Lieutenant Colonel Kiskowski admonished Dr. Hall to report his concerns through the chain of command, this fact alone does not provide the nexus between Dr. Hall's reporting activity and the alleged discrimination. Multiple inferences must be drawn from this statement to find that Dugway's alleged hostility was motivated by a desire to retaliate. Furthermore, in context, the statement is ambiguous because several people testified that they understood Lieutenant Colonel Kiskowski's order not to prohibit Dr. Hall from reporting his concerns to outside agencies, but to ensure that Dugway first was aware of the issues so it could immediately address any safety or environmental problems.[5]

Third, Colonel Dean Ertwine, the head of Dugway's Material Test Command,

---

[5]Lieutenant Colonel Kiskowski testified that although he acknowledged that Dr. Hall had a "constitutional right" to report concerns to whomever he wanted, "[w]hat I was concerned about is that there were potential safety or environmental problems somewhere down in the lab . . . and he had not informed his immediate supervisor of those problems." Lieutenant Colonel Stansbury, the Chemical Test Division Chief and Dr. Hall's second-line supervisor, testified that his understanding of Lieutenant Colonel Kiskowski's instruction was, "Give the chain of command the opportunity to correct any kind of deficiencies or answer any kind of concerns you may have, and if you're not satisfied, then exercise your authority" to report to outside agencies. Mr. Steelman, when asked if he recalled Dr. Hall being instructed not to communicate with federal or state agencies, said, "I don't believe that's correct. I believe his instructions were not to contact them before he contacted his internal Dugway chain of command."

which includes both the Chem Lab and the Joint Operations Directorate ("JOD"), offered Dr. Hall a temporary detail outside Chem Lab in the JOD in 1991. According to Dr. Hall's notes, Colonel Ertwine stated at the time that he was concerned that the transfer not appear as if it were in retaliation for Dr. Hall's reports to OSHA. Dr. Hall's notes read, "Col. Ertwine does not want the appearance that I am being moved out in retaliation for having caused an OSHA inspection. He and I agreed that would be very counterproductive insofar as getting employees to take safety and hazardous waste matters seriously." One permissible inference to be drawn from the statement is that Colonel Ertwine wanted to prevent others from feeling inhibited in their ability to report safety concerns because of a belief that Dr. Hall was transferred because he reported such concerns. As noted, statements susceptible to two different interpretations—one discriminatory, the other not—is not direct evidence of illegal animus.

Fourth, Dr. Harvey, a fellow chemist at Dugway, testified that in 1997 he was ordered to submit to a fitness-for-duty exam at the same time as another employee (who Dr. Harvey believed to be Dr. Hall) in order to avoid the appearance of disparate treatment with respect to the other employee's exam. Again, retaliatory motive must be inferred from this evidence because Dr. Harvey's testimony requires one to infer that the other employee was Dr. Hall. Moreover, the testimony provides no explicit nexus between Dugway's decision to require Dr. Hall to submit to a fitness-for-duty exam and Dr. Hall's protected activity. *See McCowan v. All Star Maint. Inc.*, 273 F.3d 917, 922

-18-

n.3 (10th Cir. 2001) ("When a plaintiff alleges that discriminatory comments constitute direct evidence of discrimination, . . . the plaintiff must demonstrate a nexus exists between the allegedly discriminatory statements and the decision to terminate her." (alteration and quotation omitted)). As such, it does not constitute direct evidence.

Fifth, Dr. Gary Resnick, a supervisor, instructed Dr. Hall's immediate supervisor at the time, Dr. Lyman Condie, to "turkey farm" Dr. Hall. Dr. Hall argues this statement is an expression of hostility, but the meaning of this statement is ambiguous. In context, the comment supports an inference that Dr. Resnick intended Dr. Hall to be placed on non-critical assignments due to Dr. Hall's lack of productivity, not due to his reporting of environmental and safety concerns. Though retaliatory comments made by a manager responsible for the employment decision at issue during the decision-making process might constitute direct evidence of discrimination, the same does not hold true for ambiguous statements where the retaliatory motive is not apparent on its face. *See Danville v. Reg'l Lab Corp.*, 292 F.3d 1246, 1249 (10th Cir. 2002) (when decision-maker's comment that plaintiff "might not be around very long" could have referred either to plaintiff's age or to her tendency to change jobs frequently, the comment was only circumstantial evidence of discrimination).

Finally, Dr. Hall contends that statements appearing in an internal Dugway memorandum regarding Dr. Hall, composed after Dr. Hall wrote to United States Senator Carl Levin expressing concerns about safety at Dugway, are direct evidence of

retaliation. Dr. Hall's letter to Senator Levin resulted in a report to the Secretary of the Army by Senator Levin on behalf of the Senate Subcommittee on Oversight of Government Management regarding concerns about safety at Dugway. Colonel Cox, Dugway's Commander, composed an internal memorandum to Dr. Frank Bagley, Dr. Hall's immediate supervisor at the time, explaining the actions he intended to take in response to the Senate's report to the Secretary. These actions included briefing the Under Secretary of the Army and advising employees that they must cooperate to resolve problems in the lab and must advise Dugway in writing of any future safety concerns. The memo expresses anxiety that, in the context of declining defense spending, base closure is a serious concern if Dugway has to explain to Senators why "we are not doing our job right." The memo further states that supervisors should discuss the "gravity of the situation" with Dr. Hall and that he "must understand that we can resolve his concerns here" using "Dugway, then Army assets, prior to raising issues with OSHA, EPA, Congress, etc."

There is no indication of retaliatory intent here, and the ARB could infer that Colonel Cox was merely appropriately concerned with resolving issues within the chain of command. Moreover, none of these statements are connected to any hostile action taken against Dr. Hall. As such, Colonel Cox's memo, at best, constitutes circumstantial

evidence of retaliatory motive, but it is not direct evidence under the law of this Circuit.[6]

The statements and evidence advanced by Dr. Hall on appeal are not direct evidence of retaliation. Instead, they are evidence from which a retaliatory purpose could arguably be inferred. Because there is no direct evidence to satisfy Dr. Hall's burden to prove retaliatory motive, the ARB did not abuse its discretion in refusing to shift the burden of proof to Dugway.

2.      *Circumstantial Evidence of Retaliatory Motive*

Dr. Hall argues the ARB's determination that he failed to prove a causal nexus between his protected activity and the alleged hostility against him is not supported by substantial evidence. As support for his contention that he was subjected to this hostility because he engaged in protected conduct, he cites the evidence we previously discussed and rejected as direct evidence of discrimination, as well as evidence (1) that the Army has a policy of retaliating against whistleblowers; (2) that Dugway did not follow procedure in dealing with Dr. Hall in different situations; (3) that the timing of certain alleged hostile acts is so close in time to his protected activity to justify finding retaliation; (4) that Dugway subjected his work product to hostile editing; and (5) that the ARB should have payed more credence to the ALJ's positive credibility determination

---

[6]Dr. Hall also claims that Army Commander Colonel John Como decided to revoke Dr. Hall's security clearance based on a packet of information that included Dr. Hall's whistleblower complaint. He argues this is direct evidence of retaliation. As explained *supra*, per *Egan*, neither the Board, nor this Court has authority to review this action or the motives surrounding it.

-21-

regarding Dr. Hall. We have reviewed Dr. Hall's assertions on appeal, the ARB's decision, and the record on appeal, including the ALJ's RD&O, and find that substantial evidence supports the ARB's conclusions. In so finding, we acknowledge that a reasonable person may infer that the Army's alleged hostility against Dr. Hall was related to his protected activity. Our standard of review, however, is not de novo. We are charged only with determining whether the Board's decision to the contrary is supported by substantial evidence, which we have already described as more than a scintilla, but less than a preponderance of the evidence. *See Zoltanski*, 372 F.3d at 1200.

First, the ARB rejected Dr. Hall's contention that there was a "clear Army policy" that treated employees who reported to outside agencies as disloyal and subject to discipline. As support for his contention that the ARB erred in this determination, he points to: (1) a statement by General Akin in a Dugway newsletter that he had deep concern with employees who reported outside their chain of command; (2) a Defense Investigative Services ("DIS") report that stated that one of Dr. Hall's supervisors said Dr. Hall admitted to blowing the whistle in the past but that Dr. Hall has improved in this respect and is "more willing to work through proper channels"; (3) Dugway's treatment of fellow Dugway employee Judy Moran; and (4) Dr. Hall's testimony that a supervisor made reference to Dr. Hall as one who cannot be trusted not to report to the state environmental agency.

Substantial evidence supports the ARB's conclusion that Dr. Hall failed to prove

that Dugway had a policy of retaliation against whistleblowers. First, the alleged statement by General Akin does not appear in the record (nor did it appear in the record before the ARB). Second, the statements in the DIS report regarding Dr. Hall's whistleblowing are evidence as to Dugway's knowledge of Dr. Hall's protected activities, but that fact is not contested. Taken in its full context, the statement indicates legitimate employer concern with employee performance—the statement forms part of a discussion of a supervisor's concerns with Dr. Hall's productivity and difficulty in handling work situations, evidenced by his tendency to go straight to supervisors without attempting to resolve problems on his own. Third, substantial evidence supports the ARB's determination that Dugway's treatment of Ms. Moran does not evidence a retaliation policy. Dr. Hall relies upon the ALJ's conclusion that Ms. Moran "credibly testified" that Dugway would not hesitate to conceal environmental violations to the State. As the ARB points out, the testimony of one witness that Dugway generally may conceal environmental violations does not conclusively prove that Dugway has a policy of retaliation against whistleblowers, much less that Dr. Hall's supervisors took retaliatory action against him for reporting environmental violations. In rejecting the ALJ's credibility determination of Ms. Moran, the ARB recognized conflicting evidence in the record showing that Dugway did not retaliate against Ms. Moran as Dr. Hall alleged and noted the testimony of three other employees who engaged in whistleblowing activity but experienced no retaliation from Dugway. The ARB clearly and logically

stated its reasons for finding against the ALJ's determination that there was a policy of retaliation at Dugway as alleged by Ms. Moran. Finally, that Dugway managers believed Dr. Hall "[could not] be trusted" does not require a conclusion that Dugway had a policy of retaliating against whistleblowers because the record also contained evidence that other employees engaged in whistleblowing but suffered no disciplinary actions.

Second, the ARB also rejected Dr. Hall's contention that instances of irregular procedure proves that he was retaliated against. First, he argues that Commander Como's recommendation to revoke Dr. Hall's security clearance without waiting for a response from Dr. Hall showed inadequate investigation and irregular procedure, both of which prove retaliatory motive in that decision. We have already held that *Egan* prohibits both the Board's and this Court's inquiry in the motives behind security clearance review. Although *Egan* does allow review of an agency's compliance with its own procedures, Dr. Hall does not provide us with the procedure that Commander Como should have but failed to follow.[7]

Also as an example of irregular procedure, Dr. Hall argues that Lieutenant

---

[7]Similarly, Dugway's actions in rating Dr. Hall as fully successful in his performance evaluations in 1992 and 1995 but telling a psychiatrist that examined Dr. Hall on October 1, 1996 that he was experiencing unsatisfactory performance is not reviewable evidence of retaliatory motive. The psychiatric evaluation was part of the DIS's reinvestigation of Dr. Hall's security clearance and, per *Egan*, the Board cannot examine the legitimacy of Dugway's concerns in evaluating his clearance. For the same reason, we reject Dr. Hall's contention that Dugway raised old allegations of sexual harassment in an attempt to influence the outcome of Dr. Hall's security clearance review.

-24-

Colonel Kiskowski's failure in a February 1997 meeting to comply with procedure requiring advance notice to union officials of meetings with union employees is evidence of retaliatory motive. The ARB concluded that although Lieutenant Colonel Kiskowski did fail to follow procedure in this respect, Dr. Hall failed to prove that this failure was in retaliation for his protected conduct. The ARB martialed substantial evidence to support its finding that the meeting was called as a result of Dr. Hall's deficient work performance, and not evidence of retaliatory motive.

Third, Dr. Hall argues that the ARB failed to take account of retaliatory actions that occurred so close in time to his protected activity as to justify an inference of retaliatory motive. A factfinder may infer retaliatory motive from the fact that a hostile action is taken shortly after an employee's protected activity, *see, e.g.*, *Weaver v. Chavez*, 458 F.3d 1096, 1098 (10th Cir. 2006), but it is not required to do so. Dr. Hall was reassigned to the JOD shortly after he engaged in protected activity. The ARB found, however, and the record supports, that Dr. Hall's temporary reassignment to the JOD was motivated by supervisors' desire to give Dr. Hall an environment in which he had better opportunity for advancement and to separate quarreling employees in the Chem Lab. Moreover, the ARB found that the transfer could not even be characterized as a "hostile" act, and we find the record supports this conclusion for the reasons stated in the ARB's Order.

Fourth, the ARB rejected the ALJ's view of the evidence supporting Dr. Hall's

claim that "hostile editing" contributed to a hostile work environment. Dr. Hall alleged that Christine Wheeler, a Dugway technical editor who edited Dr. Hall's work, made it impossible for him to complete a report on time. The ALJ agreed, in part because he believed Ms. Wheeler was "arrogant." The ARB rejected the ALJ's conclusion, noting that Ms. Wheeler's purported arrogance alone does not prove that she intentionally obstructed Dr. Hall's efforts to finish his report or that if she did obstruct his report it was because of his protected activity. To support its rejection of the ALJ's credibility determination, the ARB referred to evidence in the record that Ms. Wheeler's edits were "routine, prompt, and clear" and noted the testimony of Jim Barnett, a union vice president, that Ms. Wheeler's editing of Dr. Hall's report was like her editing of other people's work, including his own. Although the record does contain testimony from union official Michael LeFevre that he believed it was "possible" that Ms. Wheeler intentionally blocked Dr. Hall's report, the ALJ made no credibility determinations with respect to this witness and, given the other record evidence, the evidence is sufficiently substantial even under the heightened credibility standard to reject the ALJ's conclusion as to the charge of "hostile editing."

Finally, Dr. Hall objects to the ARB's rejection of the ALJ's across-the-board credibility determination in favor of Dr. Hall in the face of conflicting and substantial evidence in the record. The ALJ found that Dr. Hall took "good notes" and is an "honest, conscientious and dedicated individual," and therefore generally credited his

testimony. The ARB found that the ALJ evaluated only Dr. Hall's credibility, despite the fact that 50 witnesses testified, 40 of whom testified against Dr. Hall. *See Be-Lo Stores v. N.L.R.B.*, 126 F.3d 268, 279 (4th Cir. 1997) (rejecting ALJ's "generalized, conclusory statement" about credibility determinations with respect to multiple witnesses). The ARB also explained that the ALJ failed to weigh or to discuss the reasons for discounting conflicting evidence. *See Brindisi v. Barnhart*, 315 F.3d 783, 787–88 (7th Cir. 2003) (rejecting ALJ's conclusions for lack of adequate discussion of conflicting evidence). It is not illogical for the ARB to question the ALJ's credibility determination favoring Dr. Hall in this respect.

C.    Alternative Theory of Constructive Discharge

As a final matter, we note that Dr. Hall argues the ARB erred in failing to recognize and analyze his claims under a specific theory of constructive discharge. To prevail on a constructive discharge claim, a plaintiff must show either that (1) "the employer by its illegal discriminatory acts has made working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign," *Sanchez*, 164 F.3d at 534 (quotation omitted), or (2) the employer by its discriminatory actions forced the plaintiff to choose between resignation or termination, *Burks v. Oklahoma Publ'g Co.*, 81 F.3d 975, 978 (10th Cir. 1996); *Acrey v. Am. Sheep Indus. Ass'n*, 981 F.2d 1569, 1573–74 (10th Cir. 1992). In issuing its recommended decision, the ALJ referred only to the first method of proving constructive discharge. Although he made

-27-

no clear effort to delineate separate constructive discharge claims before the ALJ or the ARB, Dr. Hall now contends that the ARB erred by failing to directly address whether Dugway constructively discharged him by forcing him to choose between resignation and termination. Because Dr. Hall raises this second theory of constructive discharge for the first time on appeal, the argument is waived. *See Jantzen v. Hawkins*, 188 F.3d 1247, 1257 (10th Cir. 1999) ("We will not consider an appellant's new legal theory on appeal, even if it falls under the same general category as an argument presented at trial." (internal quotation omitted)); *see also Taylor v. U.S. Dep't of Labor*, 440 F.3d 1, 8–9 (1st Cir. 2005) (refusing appellate review based on a new legal theory that appellant failed to raise during the administrative hearings before both the ALJ and ARB).[8]

_____

[8]During Dr. Hall's opening statement before the ALJ, his counsel asserted that Dr. Hall "basically became convinced that the Army's intent at this point . . . was to either terminate his employment . . . or to remove his security clearance," so Dr. Hall terminated his employment to "mitigate the damage he was absolutely certain was about to occur, which was his termination and the removal of his security clearance." During the hearing, Dr. Hall's attorney also referred to the alleged constructive discharge as "forced retirement." Dr. Hall maintains that these statements squarely raise the second theory of constructive discharge. We disagree. These ambiguous allegations unsupported by legal argument or citation to evidentiary support in the record are insufficient to raise the specific legal theory Dr. Hall now alleges the ARB overlooked. The ARB cannot be charged with reviewing the entire record to glean and *sua sponte* raise legal theories referenced only obliquely by a party but not clearly articulated in its briefs or ruled on by the ALJ.

In any case, Dr. Hall's newly articulated distinction makes no difference. As part of its analysis of the "first" claim—that Dugway constructively discharged Dr. Hall by subjecting him to a hostile work environment—the ARB evaluated each act that Dr. Hall now alleges "communicated a threat of imminent termination" and determined that there was no retaliatory motive behind the actions. Because Dr. Hall must show retaliatory motive to succeed on either theory of constructive discharge, the ARB's analysis and

## III.  CONCLUSION

For the foregoing reasons, we AFFIRM.

---

factual findings on the "first" constructive discharge claim precludes success on the "second."