**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 7, 2016**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

BNSF RAILWAY COMPANY,

    Petitioner,

v.

UNITED STATES DEPARTMENT OF
LABOR, ADMINISTRATIVE REVIEW
BOARD,

    Respondent.

_____

CHRISTOPHER CAIN,

    Intervenor.

No. 14-9602

_____

**Petition for review from an Order of the**
**Department of Labor (except OSHA)**
**(LABR No. 13-006)**
_____

Stephen F. Fink, Thompson & Knight, Dallas, Texas (Bryan Neal; Micah R. Prude, Thompson & Knight, LLP, Dallas, Texas, on the briefs), for Petitioner.

Sarah J. Starrett, Attorney (M. Patricia Smith, Solicitor of Labor, Jennifer S. Brand, Associate Solicitor, William C. Lesser, Deputy Associate Solicitor, and Megan E. Guenther, Counsel for Whistleblower Programs, with her on the brief), U. S. Department of Labor, Washington, D.C., for Respondent.

Newton G. McCoy (Robert J. Friedman and C. Marshall Friedman, C. Marshall Friedman, P.C., Saint Louis, Missouri, with him on the brief), St. Louis, Missouri, for Intervenor.

_____

Before **KELLY**, **LUCERO**, and **PHILLIPS**, Circuit Judges.

_____

**PHILLIPS**, Circuit Judge.

_____

BNSF Railway petitions for review of the Administrative Review Board's (the Board) decisions (1) affirming an Administrative Law Judge's (ALJ) finding that BNSF violated the Federal Railroad Safety Act (FRSA or the Act), 49 U.S.C. § 20109, when it fired BNSF employee Christopher Cain, and (2) the ALJ's imposing punitive damages for the violation. Exercising jurisdiction under 49 U.S.C. § 20109(d)(4) and § 42121(b)(4)(A), we deny the petition in part, grant it in part, and remand to the Board for further proceedings.

## BACKGROUND

In February 2006, BNSF hired Christopher Cain as a sheet-metal worker. He worked primarily at BNSF's Argentine Rail Yard in Kansas City, Kansas, but also worked regularly at the Murray Rail Yard in Kansas City, Missouri. Cain drove between the two rail yards in a BNSF-provided pickup truck about "4 days a week for many months." R. vol. I at 814. Paul Schakel, the Facility Supervisor, was Cain's direct foreman. Schakel reported to John Reppond, a general foreman, and Reppond reported to Dennis Bossolono, the shop superintendent of the two rail yards.

In early January 2010, Cain felt chest pains and sought treatment at an emergency room. Cain had a medical history of lung, chest, and respiratory problems.

2

A few days later he visited a doctor, who prescribed pain medication for his chest pain.[1]

On January 27, 2010, when Cain was driving the BNSF pickup truck back to the Argentine yard from the Murray yard, he rear-ended a produce truck stopped at a red light. He later explained on scene to the investigating police officer that "his brakes failed." *Id.* At the scene, Cain wrote a brief account of the accident. Cain said that he had stopped at a four-way intersection before driving toward the produce truck, which was stopped at a red light. Cain said that as he approached the stopped truck he pushed his brake pedal, which "didn't feel [r]ight." *Id.* at 756. Faced with this problem, Cain said he swerved but still hit the back of the produce truck. Cain was wearing his seat belt. Because the accident totaled the BNSF truck, another BNSF employee got Cain and drove him back to the Argentine yard. The police officer investigating the accident did not issue Cain a citation.

After arriving back at the Argentine yard that day, Cain filled out, signed, and filed BNSF's Employee Personal Injury/Occupational Illness Report (Report), identifying as his injuries a skinned knuckle and a bruised knee. Cain never sought medical treatment for those injuries. So that it can comply with its requirements under the Act, BNSF requires its injured employees to complete this report and to notify their supervisors of any treatment received for work-related injuries. As stated

---

[1] Cain testified before the ALJ that he suffered a "chest wall strain" while loading cows in a trailer. R. vol. I at 214. But Cain admitted that he "never talked to anybody at work" about that incident. *Id.* at 204. The doctors Cain saw before the accident told him that the chest-wall strain could have been from coughing or some other illness.

in the Report, BNSF also requires that employees "promptly notify [their] supervisor . . . if [the employees] experience any complications resulting from [the] injury/illness." *Id.* at 369.

During BNSF's investigation, Cain claimed that he had been in shock when he filled out the Report and had no memory of doing so. In support, Cain pointed to his "shaky handwriting and one-word answers." *Id.* at 815. The day after the accident, Cain e-mailed supervisor Reppond to tell Reppond that Cain's finger and knee were fine, but that Cain would miss work that day because he had slept poorly and was sore from coughing. Cain missed work the following day too, telling Reppond that he was still coughing. Cain says that his chest pains worsened after the accident.

On February 17, 2010, Cain sought medical treatment at Dr. Scott Teeter's office where a nurse practitioner, Donnette Streeter, diagnosed a rib fracture and excess fluid surrounding his lungs. In a medical report filed the next day, the nurse practitioner described that the bruising on Cain's chest was "probably from his seatbelt." *Id.* at 774. Although the nurse practitioner told Cain this, Cain testified that he "wanted to know . . . what exactly was going on" before filing an updated Report that listed possibly more significant injuries. *Id.* at 155. That same day, Cain called Reppond to tell him that Cain needed the next two work days off to have excess fluid drained from Cain's lungs. Reppond asked Cain if this medical condition related to the accident and noted later that "Cain was adamant that this had nothing to do with his on duty automobile accident." *Id.* at 391. On February 22, 2010, Cain completed a "Medical Status Form," where he wrote that he was going to have (and did have)

4

minor lung surgery the next day. Immediately upon Cain's return to work after this medical treatment, BNSF assigned him to work in the diesel service facility, which Cain described as the "dirtiest, smokiest[, most] hideous place on the yard." *Id.* at 164.

On February 23, 2010, BNSF notified Cain that it was investigating whether he had violated its rules by possibly driving poorly and causing the truck accident. In particular, it investigated whether Cain had violated BNSF's Mechanical Safety Rule S-28.1.1: Maintaining a Safe Course ("In case of doubt or uncertainty, take the safe course."); Rule S-28.1.2: Alert and Attentive ("Employees must be careful to prevent injuring themselves or others. They must be alert and attentive when performing their duties and plan their work to avoid injury."); and Rule S-28.6: Conduct ("Employees must not be: (1) [c]areless of the safety of themselves or others, (2) [n]egligent, (3) [i]nsubordinate, (4) [d]ishonest, (5) [i]mmoral, (6) [q]uarrelsome, or (7) [d]iscourteous."). R. vol. I at 555–56. BNSF advised Cain that he needed to attend a hearing on this matter set for March 10, 2010. Cain and BNSF twice agreed to postpone the hearing, ultimately until May 18, 2010.

On April 8, 2010, Cain saw Dr. Shantikumar Gandhi, who told Cain that the truck collision had caused his chest and lung injuries. Later that day, Cain filed an updated Report with BNSF about his January accident. As part of his doing so, he encountered supervisors Reppond and Schakel, who discouraged him from filing the updated Report. Cain later testified that Reppond told him that if he filed the updated Report "this wasn't going to go well for [you]." *Id.* at 902. Cain also testified that

5

Schakel urged him not to file the report, saying that doing so would hurt managers and supervisors because BNSF would have to report the accident and injuries to the Federal Railroad Administration (FRA).[2] *See* 49 C.F.R. §§ 225.1, 225.19 (requiring railroads to report any work-related accidents that result in medical treatment or significant injury). Despite the opposition, Cain still filed the updated Report, recounting his previous medical appointments and identifying three additional injuries caused by the accident: a "Broken Rib [due] to Seat Belt Hitting Chest & No Air Bag," bleeding in the pleural cavity, and a collapsed lung. R. vol. I at 403.

On April 30, 2010, BNSF notified Cain that it also had begun investigating whether he had violated company rules by the late reporting of his injuries and medical treatment arising from the truck accident. On May 13, 2010, Cain attended BNSF's investigative meeting on this issue. On May 18, 2010, Cain attended BNSF's investigative meeting on the issues connected with his driving conduct leading up to the truck accident.

On June 2, 2010, BNSF issued a written decision suspending Cain for 30 days for violating its rules associated with safely driving its automobiles. In addition, BNSF placed Cain on probation for three years, retroactive to the date of the

---

[2] The ALJ fully credited Cain's testimony about Reppond's and Schakel's discouraging Cain from filing the updated Report. The Board accepted the ALJ's crediting Cain's testimony about the supervisors' statements and noted that BNSF did not provide contrary evidence. BNSF does not dispute that the supervisors made the statements, but it contends that the comments were "isolated and innocuous." Pet'r's Opening Br. at 32.

6

accident, January 27, 2010. BNSF's written decision noted that "[a]ny rules violation during this probation period could result in further disciplinary action." *Id.* at 563.

Only six days later, on June 8, 2010, BNSF terminated Cain's employment for Cain's "fail[ing] to report to the proper manager that [he] had received medical treatment related to [his] vehicle accident on January 27, 2010." *Id.* at 565. As Cain understood it, BNSF was basing his termination on his "not filing an injury report in a timely manner." *Id.* at 165. During his deposition, Reppond said that BNSF dismissed Cain "for an accumulation of discipline events per our . . . guidelines." *Id.* at 799. Similarly, Bossolono stated that BNSF fired Cain "for accumulation of discipline events with the latest one being failure to report that he had received medical treatment for an on-duty injury." *Id.* at 973. The ALJ found that "the termination was for violation of probation, which had been applied retroactively to the [accident]." *Id.* at 1122. BNSF objected to this finding before the Board but did not argue why the ALJ erred in making that finding. BNSF does not challenge the ALJ's finding in the petition for review.

In November 2010, after Cain's union unsuccessfully sought back wages under the collective-bargaining agreement, Cain filed a complaint under FRSA with the Occupational Safety and Health Administration (OSHA). In December 2011, an OSHA regional administrator denied Cain's claims under 49 U.S.C. § 20109. The administrator concluded that Cain had not shown a prima facie case of retaliation

7

under FRSA.[3] Specifically, the administrator concluded that even if Cain had engaged in protected activity by filing the April 8 updated Report, that activity had not been a contributing factor in BNSF's firing Cain. The administrator rested this conclusion on his view that BNSF had proffered legitimate, non-retaliatory reasons for firing Cain.

Cain objected to the OSHA administrator's findings. On review, an ALJ concluded that Cain had demonstrated that BNSF had violated the Act, entitling him to back wages.[4] In reaching this result, the ALJ first accepted the parties' stipulation that Cain had engaged in a protected activity by filing a report with BNSF on the day of the accident. From there, the ALJ found that, "once [Cain engaged] in protected activity, [he] remain[ed] in status as long as subsequent events reasonably relate[d] to the initial protected activity." R. vol. I at 1118. Accordingly, the ALJ concluded that Cain had engaged in protected activity by filing the April 8 updated Report.

The ALJ then turned to whether Cain's protected activity had been a "contributing factor" in BNSF's decision to fire him. The ALJ concluded that Cain's

---

[3] The Act requires a plaintiff to "make[] a prima facie showing that any behavior described [as a protected activity] was a contributing factor in the unfavorable personnel action alleged in the complaint." 49 U.S.C. § 42121(b)(2)(B)(i).

[4] The ALJ addressed both Cain's suspension and termination, finding that BNSF "did not meet its burden to prove that but for the protected activity it would have suspended [Cain]." R. vol. I at 1122. The Board reversed the ALJ's suspension conclusion, determining that BNSF established by clear and convincing evidence that it would have suspended Cain for the accident even if Cain had not engaged in any protected activity. Cain has not petitioned us to review the Board's suspension decision.

8

filing the updated Report was indeed a contributing factor in Cain's firing "[b]ased upon the common nexus of the accident in January and the sequence[] of events surrounding [BNSF's] investigation." *Id.* at 1119. In addition, the ALJ concluded that BNSF had retaliated against Cain for filing the updated Report by transferring Cain to the diesel service facility.

The ALJ then considered whether BNSF could show, by clear and convincing evidence, that it would have fired Cain even if he had not filed the updated Report. *See* 49 U.S.C. § 42121(b)(2)(B)(ii). The ALJ concluded that BNSF had not met its burden. The ALJ found that BNSF had not shown that Cain knew or should have known before his filing the updated Report that the accident had caused his injuries or aggravated any preexisting conditions. The ALJ also found that BNSF had offered shifting explanations for terminating Cain's employment.

With liability established, the ALJ turned to remedies. The ALJ awarded Cain $10,511.05 in back wages (which the Board later reversed based on the parties' stipulating that there were $5,780.52 in lost wages) and $1 in compensatory, nominal damages "for pain and suffering," despite Cain's providing no evidence of pain and suffering or of medical bills. R. vol. I at 1129. Next, the ALJ noted that the Act allowed punitive damages up to a $250,000 cap. In considering the amount, if any, of punitive damages to award, the ALJ first recited the Supreme Court's three punitive-damages guideposts: (1) "the degree of . . . reprehensibility or culpability" of the defendant's conduct, (2) "the relationship between the penalty and the harm to the victim" that the defendant caused, and (3) the sanctions other courts imposed for

comparable misconduct. *Id.* (citing *Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 523 U.S. 424, 434–35 (2001)); *see State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003) (instructing courts to review punitive damages using the three guideposts).

Addressing the reprehensibility of BNSF's conduct, the ALJ found that "several of [BNSF's] management employees conspired to defeat [Cain's] right to submit a medical claim and deprive him of his job" and concluded that "the assignment to the worst place in the yard [the diesel service facility] was wanton and willful and an equivalent to an intentional tort." R. vol. I at 1130. The ALJ also considered cases with what it viewed as similar misconduct and concluded that "the conspiracy to deny [Cain] his right to pursue his medical claim is as obnoxious" as the behavior punished in those cases. *Id.* at 1131. For instance, the ALJ referenced a case in which another ALJ had awarded $250,000 in punitive damages based on an employer's failing to disclose the exonerating results of an internal investigation about a complainant whom the employer had transferred to a less desirable career field and had subjected to a hostile work environment.[5]

BNSF appealed the ALJ's decision to the Board. The Board agreed with the ALJ that Cain had established a prima facie case of discrimination under 49 U.S.C. § 42121(b)(2)(B)(i).[6] Specifically, the Board determined that Cain had shown that his

---

[5] We do not see where in his order the ALJ applied the second guidepost.

[6] The Board rejected BNSF's argument that Cain had not engaged in protected activity when he filed the updated Report. The Board concluded that substantial

filing the updated Report had been a "contributing factor" in his termination. In particular, it concluded that Cain could satisfy his contributing-factor burden by showing that his updated Report, "'alone or in combination with other factors,' tends to affect in any way the employer's decision or the adverse action taken." R. vol. II at 1747 (quoting *Henderson v. Wheeling & Lake Erie Ry.*, No. 11-013, 2012 WL 5818126, at *6 (Admin. Review Bd. Oct. 26, 2012)). Because the Board determined that BNSF's stated reason for terminating Cain—his failure to file a timely report— "was directly linked to the amended injury report filed on April 8," it concluded that Cain's report had been a contributing factor to BNSF's decision to terminate him. *Id.*

Advancing to the next step set out in the statutory framework, the Board agreed with the ALJ that BNSF had not met its burden to show by clear and convincing evidence that it would have fired Cain absent his filing the updated Report. *See* 49 U.S.C. §§ 20109(d)(2)(A)(i), 42121(b)(2)(B)(ii). In fact, the Board found the opposite, noting that BNSF did not even allege that it "would have terminated Cain's employment absent his filing the report on April 8, 2010 . . . ." R. vol. II at 1750. In addition, the Board noted that the "violation" of the retroactive probationary term BNSF imposed as part of Cain's suspension six days earlier "would not have occurred in the absence of the April 8 report and BNSF does not

---

evidence supported the ALJ's finding, interpreting the finding to mean that Cain's initial report and updated Report were "inextricably intertwined." R. vol. II at 1746 n.8. BNSF does not challenge the Board's protected-activity conclusion in its petition for review.

11

offer an alternative reason that is not connected to the April 8 report for Cain's dismissal." *Id.*

Despite finding BNSF in violation of the Act, the Board halved the punitive-damages award to $125,000. In doing so, it first rejected BNSF's argument—and the ALJ's approach—that the *State Farm* guideposts controlled the Board's consideration of punitive damages. Instead, the Board concluded that Congress had removed any need for the guideposts analysis by authorizing punitive damages capped at $250,000. But the Board agreed in part with BNSF that the ALJ erred in imposing the maximum-available punitive-damages award. Although the Board agreed with the ALJ's conspiracy finding (noting that "a number of employees were involved with the decision to retaliate against [Cain]"), the Board concluded that the ALJ erred in awarding punitive damages for Cain's reassignment to the diesel service facility. *Id.* at 1752–53. The Board noted that Cain had never even argued that this job assignment amounted to an adverse employment action. Because the "ALJ devoted half of his summary analysis to his determination that BNSF must pay $250,000 in punitive damages," the Board reduced the punitive-damages award to $125,000. *Id.* at 1753. BNSF timely filed a petition for review. *See* 49 U.S.C. § 20109(d)(4).

## DISCUSSION

### I. Standard of Review

We review the Administrative Review Board's decisions under the Administrative Procedure Act, 5 U.S.C. § 706. *See* 49 U.S.C. § 20109(d)(4); *Hall v. U.S. Dep't of Labor*, 476 F.3d 847, 850 (10th Cir. 2007). A "reviewing court shall

12

. . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "unsupported by substantial evidence." 5 U.S.C. § 706. In reviewing under the arbitrary-and-capricious standard, "we must engage in a substantial inquiry." *Andalex Res., Inc. v. Mine Safety & Health Admin.*, 792 F.3d 1252, 1257 (10th Cir. 2015) (quotation marks omitted). "Yet our scope of review is narrow." *Id.* We must decide "whether the agency examined the relevant data and articulated a rational connection between the facts found and the decision made." *Id.* (quoting *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1574 (10th Cir. 1994)).

To satisfy the substantial-evidence standard, an agency need rely only on "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (quoting *Hackett v. Barnhart*, 395 F.3d 1168, 1172 (10th Cir. 2005)). The standard "requires more than a scintilla, but less than a preponderance." *Id.* "[W]e 'neither reweigh the evidence nor substitute our judgment for that of the agency.'" *Branum v. Barnhart*, 385 F.3d 1268, 1270 (10th Cir. 2004) (quoting *Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 800 (10th Cir. 1991)).

Ultimately, we review de novo the Board's legal determinations, and we defer to the ARB's reasonable construction of applicable statutes. *Trimmer v. U.S. Dep't of Labor*, 174 F.3d 1098, 1102 (10th Cir. 1999). Our review is "very deferential to the agency." *Ron Peterson Firearms, LLC v. Jones*, 760 F.3d 1147, 1161 (10th Cir. 2014) (quoting *Hillsdale Envtl. Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*,

13

702 F.3d 1156, 1165 (10th Cir. 2012)). Further, "[a] presumption of validity attaches to the agency action and the burden of proof rests with the parties who challenge it." *Id.* at 1162 (alteration in original) (quoting *Hillsdale Envtl.*, 702 F.3d at 1165).

## II.     The Federal Railroad Safety Act

A railroad cannot discriminate against, suspend, or discharge an employee for notifying or attempting to notify the railroad about an on-the-job injury or medical treatment for that injury. 49 U.S.C. § 20109(a)(4); 29 C.F.R. § 1982.102(b). In pursuing a claim under the Act, an employee has the burden to establish a prima facie case, showing that the employee's protected activity "was a contributing factor in the unfavorable personnel action alleged in the complaint." 49 U.S.C. § 42121(b)(2)(B)(i). Upon an employee's doing so, the burden switches to the employer to demonstrate "clear and convincing evidence that the employer would have taken the same unfavorable personnel action in the absence of [the employee's protected activity]." *Id.* § 42121(b)(2)(B)(iv). The Act provides as remedies "all relief necessary to make the employee whole," including reinstatement, back wages with interest, and compensatory and punitive damages *Id.* § 20109(e)(1); *see id.* § 20109(e)(2)–(3).

## III.    Federal Railroad Safety Act Violation

### A.      Contributing-Factor Standard

To establish a violation under FRSA, a complainant must show that the protected activity was a "contributing factor" in the adverse employment action. 49 U.S.C. § 42121(b)(2)(B)(i). The Board defines a "contributing factor" as "any

14

factor, which alone or in combination with other factors, tends to affect *in any way* the outcome of the decision." *Lockheed Martin Corp. v. Admin. Review Bd., U.S. Dep't of Labor*, 717 F.3d 1121, 1136 (10th Cir. 2013) (emphasis in original) (quoting *Klopfenstein v. PCC Flow Techs. Holdings, Inc.*, No. 04-149, 2006 WL 3246904, at *13 (Admin. Rev. Bd. May 31, 2006)); *see Marano v. Dep't of Justice*, 2 F.3d 1137, 1140 (Fed. Cir. 1993) (stating that Congress "substantially reduc[ed] a whistleblower's burden to establish his case" when it enacted the contributing-factor standard). This standard is "broad and forgiving" and "was intended to overrule existing case law, which require[d] a whistleblower to prove that his protected conduct was a 'significant,' 'motivating,' 'substantial,' or 'predominant' factor in a personnel action in order to overturn that action."[7] *Lockheed Martin*, 717 F.3d at 1136 (quotation marks omitted) (quoting *Klopfenstein*, 2006 WL 3246904, at *13).

Accordingly, under the contributing-factor standard, we must decide whether the agency abused its discretion in concluding that Cain's filing the April 8 Report was a factor that tended "to affect *in any way*" BNSF's decision to terminate him. *Id.* (emphasis in original) (quotation marks omitted). Ordinarily, to meet this standard, an employee need only show "by preponderant evidence that the fact of, or the content of, the protected disclosure was one of the factors that tended to affect in any way the personnel action."[8] *Marano*, 2 F.3d at 1143. In other words, even if the

---

[7] BNSF challenges only the Board's interpretation of this standard.

[8] The employee in *Marano* sought relief under the Whistleblower Protection Act, 5 U.S.C. §§ 1201–1222. Like in FRSA, the Whistleblower Protection Act requires an employee to show that a disclosure or a protected activity "was a

15

personnel action resulted not simply from the protected activity itself (filing a report), but also from the content declared in the protected activity, the two parts are "inextricably intertwined with the investigation," meaning the protected activity was a contributing factor to the personnel action. *Id*. So if the employer would not have taken the adverse action without the protected activity, the employee's protected activity satisfies the contributing-factor standard.

But in our view, Cain's case marks an exception to this rule. Unlike in *Marano*, Cain's updated Report contained information that he himself might have violated company rules. We agree with BNSF that employees cannot immunize themselves against wrongdoing by disclosing it in a protected-activity report. *See id.* at 1142 n.5 (distinguishing the facts in *Marano* from "a situation in which an employee in essence blew the whistle on his own misconduct in an effort to acquire the [Whistleblower Protection Act's] protection" and "doubt[ing] that the [Whistleblower Protection Act] would protect such an individual from an agency's remedial actions"). Accordingly, under these circumstances, we require Cain to show more than his updated Report's loosely leading to his firing. Because BNSF contends that it fired Cain for misconduct he revealed in his updated Report, Cain cannot satisfy the contributing-factor standard merely by arguing that BNSF would not have known of his delays in reporting his injuries absent his filing the updated Report.

contributing factor in the personnel action which was taken or is to be taken against" the reporting employee. 5 U.S.C. § 1221(e)(1). If the employee establishes "that a protected disclosure was a contributing factor," the agency may avoid liability if it "demonstrates by clear and convincing evidence that it would have taken the same personnel action in the absence of such disclosure." *Id.* § 1221(e)(2).

16

Fortunately for Cain, he established more. The ALJ identified and relied upon substantial evidence supporting Cain's position that his filing the updated Report was a contributing factor in BNSF's decision to fire him. For example, the ALJ noted the temporal proximity between Cain's filing the updated Report and his firing. In addition, the ALJ considered the timing of the investigations—specifically, "the investigation that led to the firing was initiated before the investigation of whether he was responsible for the accident." R. vol. I at 1119. And perhaps most importantly, the ALJ found credible Cain's account that his BNSF supervisors had discouraged him from filing the updated Report and hinted darkly at unfavorable consequences if he did so. Only after Cain filed the updated Report did BNSF begin investigating (and ultimately fire) Cain for allegedly delaying the reporting of his full injuries sustained in the accident. Based on this evidence, we conclude that Cain's filing the updated Report was a contributing factor in BNSF's terminating his employment.

B.    Clear and Convincing Evidence

BNSF next argues that the ALJ and the Board erred in requiring BNSF to show that Cain's termination "was not related" to Cain's filing the April 8 Report. Pet'r's Opening Br. at 21. In response, the Department of Labor argues that BNSF did not show "that it had a basis for the discipline that was independent of the protected injury report and that it would have taken the same action for that reason." Resp't's Br. at 29 (citing *Speegle v. Stone & Webster Constr., Inc.*, No. 14-079, 2014 WL 7507218 (Admin. Rev. Bd. Dec. 15, 2014)).

17

To defeat liability, BNSF must show, by clear and convincing evidence, that it "would have taken the same unfavorable personnel action in the absence of [the employee's protected activity]." 49 U.S.C. § 42121(b)(2)(B)(ii). We conclude that, in holding that BNSF failed to meet this burden, the ALJ and the Board did not act arbitrarily and capriciously, and that substantial evidence supported their holdings. In fact, we agree with the Board that the evidence points the other way.

On April 8, 2010, after his doctor visit, Cain told his supervisors that the accident had caused his chest injuries. Again, as credited by the ALJ and the Board, the supervisors tried to dissuade Cain from filing an updated Report.[9] When Cain told Reppond that Cain needed to amend Cain's Report, Reppond prophetically told Cain that if Cain filed the updated Report, "this is not going to go well for [you]." R. vol. I at 689. Cain also testified that Schakel urged him not to file the report, saying that "filing the amended report was going to hurt 'everybody's safety . . . and safety chances, this was going to be reportable, it was going to be announced in lineups and this was going to hurt the managers and supervision also because it was an FRA reportable injury because it was lost time.'" *Id.* at 1128 (alteration in original) (quoting *id.* at 904); *see* 49 C.F.R. §§ 225.1, 225.19 (requiring railroads to report any work-related accidents that result in medical treatment or significant injury). The ALJ found Cain was "credible that both Mr. Reppond and Mr. Schakel exhibited animus to influence [Cain] not to make a second filing." R. vol. I at 1128.

---

[9] In its petition for review, BNSF acknowledges that the supervisors made the statements but argues that they were innocuous and isolated.

By warning Cain that things would not go well for him if he filed the updated Report, Reppond was impliedly telling Cain that if Cain did not file the report, things would go well (or at least better) for Cain. In view of this, we cannot see how BNSF can maintain that it would have fired Cain had he not filed the updated Report. The supervisors' statements directly undermine any such argument. That alone is a sufficient basis to affirm the ALJ's and the Board's decision. *Cf. Araujo v. N.J. Transit Rail Operations, Inc.*, 708 F.3d 152, 163 (3d Cir. 2013) (describing Araujo's case as less than overwhelming and noting that he had not "proffered any evidence that [the railway] dissuaded him from reporting his injury or expressed animus at him for doing so").

Other findings buttress this result. For instance, the ALJ found that BNSF was well aware early on that Cain may have suffered additional injuries in the automobile accident and yet had taken no action against him until he filed his updated Report. Specifically, the ALJ noted that "there is no doubt that there had been discussions about [Cain's] medical condition soon after the January 27 filing." R. vol. I at 1125. Based on this, the ALJ found that BNSF "was placed on inquiry notice when [Cain] took leave without pay for medical reasons [on January 28 and 29]." *Id.* As earlier stated, Reppond asked Cain directly upon Cain's requesting the two days' leave whether it was connected with the accident. At the very least, this puts BNSF in a position where it could hardly express much surprise to learn later that those injuries—requiring draining fluid from around the lung—were in fact related to the

19

accident. Only when Cain filed the updated Report over his supervisors' protests did BNSF investigate and terminate Cain for failure to timely report his injuries.

In addition, in finding that BNSF had not met its burden to show by clear and convincing evidence that it would have fired Cain even if he had not filed the updated Report, the ALJ noted that the BNSF personnel had not even agreed about who had fired Cain. From these "inconsistencies" and BNSF's "shifting explanations for the adverse personnel action, [which] in itself may be sufficient to provide evidence of pretext," the ALJ ruled that BNSF had not met its required statutory showing. *Id.* at 1127.

Finally, both the ALJ and the Board noted that BNSF had not presented evidence that it had fired any employees with similar violations. For instance, although Shop Superintendent Bossolono testified that other injured employees had told management about accidents and medical treatment, neither he nor any other BNSF manager testified about firing even a single employee who had failed to *timely* report them. *See Consolidated Rail Corp. v. U.S. Dep't of Labor*, 567 F. App'x 334, 339 (6th Cir. 2014) (unpublished) (concluding that the railroad did not meet § 42121(b)(2)(B)(ii) because the railroad had "failed to provide any evidence of disciplinary action taken as a result of" the protected activity).

For all of these reasons, we affirm the ALJ's and the Board's holding that Cain met his prima facie case and that BNSF failed to counter this with clear and convincing evidence that it would have fired Cain had it known of his delayed reporting before he filed his updated Report.

20

## IV.  Punitive Damages

BNSF also argues that the Board imposed an unlawful and unconstitutional punitive-damages award. First, BNSF asserts that the facts do not support any punitive-damages award. Second, BNSF argues that the punitive-damages award violates due process.

In affirming a partial award of punitive damages, the Board relied on its own precedent, which directs review of an ALJ's punitive-damages award to determine "whether the ALJ properly determined that punitive damages were warranted" and then "whether the amount awarded is sustainable." *Youngermann v. United Parcel Serv., Inc.*, No. 11-056, 2013 WL 1182311, at *3 (Admin. Review Bd. Feb. 27, 2013). We address each part of the Board's review in turn as well as BNSF's constitutional argument.

### A.  Awarding Any Punitive Damages

BNSF argues that substantial evidence did not support the Board's decision to affirm even the reduced punitive-damages award. In reviewing the ALJ's decision to award punitive damages, the Board considered whether BNSF had acted with a "reckless or callous disregard for the plaintiff's rights, as well as intentional violations of federal law." R. vol. II at 1751 (quoting *Youngermann*, 2013 WL 1182311, at *3); *cf. Searles v. Van Bebber*, 251 F.3d 869, 879 (10th Cir. 2001) (stating that punitive damages in a 42 U.S.C. § 1983 lawsuit are available only for conduct that is "shown to be motivated by evil motive or intent, or when it involves

reckless or callous indifference to the federally protected rights of others" (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983))).

We disagree with BNSF and conclude that substantial evidence supported the punitive-damages award. As noted, the ALJ found credible Cain's testimony about Schakel's and Reppond's efforts to keep him from filing the updated Report. In particular, we note Reppond's telling Cain, upon learning that he intended to file the updated Report, that "this is not going to go well for [you]" if he filed the Report. R. vol. I at 689. And we also rely upon Schakel's discouraging Cain from filing the report because doing so would hurt managers and supervisors because BNSF would have to report these injuries (and that the accident caused them) to the FRA.

We disagree with BNSF that Reppond's and Schakel's comments to Cain were "innocuous" because Cain still filed his updated Report. Pet'r's Opening Br. at 32. As we understand BNSF, it contends that it cannot be responsible for its supervisors discouraging workers from filing injury reports unless the workers succumbed to the pressure. This approach would measure the reprehensibility of BNSF's conduct in discouraging Cain from filing the injury report by Cain's resolve in not yielding to BNSF's reprehensible conduct. We reject that approach. In view of the ALJ's findings of fact and credibility, we conclude that substantial evidence supported the ALJ's decision to award punitive damages.

      B.      <u>The Amount of Punitive Damages</u>

The second part of the Board's analysis is whether the amount of punitive damages is sustainable. *Youngermann*, 2013 WL 1182311, at \*3. The Board disagreed with the ALJ that BNSF's reassigning Cain to the diesel service facility justified awarding the maximum amount of punitive damages, noting that Cain did not allege the reassignment as an adverse personnel action. Accordingly, the Board reduced the punitive-damages award by half, from $250,000 to $125,000, since the "ALJ devoted half of his summary analysis" to the reassignment issue. R. vol. II at 1753.

We conclude that the Board acted arbitrarily and capriciously when it halved the punitive-damages award simply because it concluded that the ALJ had erred in half of his analysis. In evaluating the Board's approach, we confine our review to ascertaining "whether the agency examined the relevant data and articulated a satisfactory explanation for its decision, including a rational connection between the facts found and the decision made." *Colo. Wild v. U.S. Forest Serv.*, 435 F.3d 1204, 1213 (10th Cir. 2006). And we conclude that the Board's half-for-half approach fails this standard. On remand, the Board must explain why the available facts support the amount of punitive damages it awards. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (stating that a reviewing court should not attempt to make up for an agency's insufficient explanation and that the agency should articulate its own satisfactory explanation for its action); *Lockheed Martin*, 717 F.3d at 1138–39 (remanding to the Board in part to delineate the amounts of back wages, medical expenses, and attorneys' fees).

23

C.     The Constitutionality of the Punitive-Damages Award

BNSF also contends that the Board's reduced punitive-damages award is unconstitutional under the Fourteenth Amendment's Due Process Clause for failure to review the punitive-damages award under the *State Farm* guideposts. In response, the Department of Labor argues that the Board need not consider the guideposts because the Act provides a statutory cap for punitive damages that ensures railroads receive fair notice of potential punitive-damages awards.

We agree with BNSF and hold that the Board must use the *State Farm* guideposts to evaluate the constitutionality of punitive damages awarded under 49 U.S.C. § 20109(e)(3). "Agencies, like courts, must follow Supreme Court decisions . . . ." *Cherokee Nation v. Norton*, 389 F.3d 1074, 1087 (10th Cir. 2004). Agencies must do so "even if the agency believes that the Court was wrong." *Id.* at 1084. We have used the guideposts to evaluate the constitutionality of punitive damages awarded under 42 U.S.C. § 1981a, which caps both punitive and compensatory damages at $300,000. *See Deters v. Equifax Credit Info. Servs., Inc.*, 202 F.3d 1262, 1272 (10th Cir. 2000).

To satisfy due process, "[o]ne must receive fair notice both that certain conduct will subject him to punishment, and the possible severity of the punishment that may be imposed." *Id.* Courts use the guideposts in assessing whether a defendant received this fair notice. *Id.*; *see BMW of N. Am. v. Gore*, 517 U.S. 559, 574 (1996) (using the guideposts to determine whether BMW received "adequate notice of the magnitude of the sanction"). The first and "most important indicium of the

24

reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *State Farm*, 538 U.S. at 419. Second, courts consider "the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award." *Id.* at 418. Finally, courts consider "the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *Id.*

The Department of Labor argues that the Board and we need not use the guideposts because § 20109 itself provides fair notice and sufficient guidance. We agree that the "landscape of our review is different" in this statutory context. *Arizona v. ASARCO LLC*, 773 F.3d 1050, 1055 (9th Cir. 2014) (en banc). When a court or agency awards punitive damages under a statute, "the rigid application of the . . . guideposts is less necessary or appropriate" because, through the statute, "the legislature has spoken explicitly on the proper scope of punitive damages." *Id.* at 1056. But the agency must use the guideposts, which are still helpful in evaluating fair notice under this different landscape. The Board should also use the statute to aid its less rigid review with the guideposts in its analysis of punitive damages under § 20109.

We did just that in *Deters* when we used § 1981a's punitive-damages terms within our guideposts analysis. For the reprehensibility guidepost, we used § 1981a's plain language both as evidence of fair notice and to conclude that the defendant's reprehensibility satisfied that language. *Deters*, 202 F.3d at 1272. For the ratio guidepost, we upheld a punitive-to-actual-damages ratio of 59:1 and acknowledged

25

that punitive damages are available under Title VII "even in the total absence of compensatory damages."[10] *Id.* at 1273. And for the comparable-awards guidepost, we noted that § 1981a authorizes up to $300,000 in combined punitive and compensatory damages and upheld a combined $300,000 award because it did not "shock the judicial conscience." *Id.*; *see* 42 U.S.C. § 1981a(b)(3).

Similarly, 49 U.S.C. § 20109 can inform the Board's guideposts analysis on remand and in future cases. For the first guidepost, § 20109 provides some notice to a railroad carrier about what conduct may subject it to punitive damages:

> A railroad carrier . . . or an officer or employee of such a railroad carrier[] may not discharge . . . or in any other way discriminate against an employee if such discrimination is due, in whole or in part, to the employee's . . . notify[ing] or attempt[ing] to notify the railroad carrier or the Secretary of Transportation of a work-related personal injury . . . .

49 U.S.C. § 20109(a)(4). And BNSF fully knew of the non-statutory standard that it had used to assess the reprehensibility of railroads' conduct: a "reckless or callous disregard for the plaintiff's rights, as well as intentional violations of federal law." R. vol. II at 1751 (quoting *Youngermann*, 2013 WL 1182311, at *3). To support its award of punitive damages under § 20109(e)(3), the Board must set forth clear findings about the degree of BNSF's reprehensibility in firing Cain for his filing the

---

[10] We analyzed the ratio in *Deters* under *BMW*, where the Supreme Court stated that "[a] general concer[n] of reasonableness . . . properly enter[s] into the constitutional calculus." *BMW*, 517 U.S. at 583 (quoting *TXO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443, 458 (1993)). The Supreme Court's caution against double-digit ratios in *State Farm* likely calls *Deters*'s 59:1 ratio into question. *See State Farm*, 538 U.S. at 425 ("[I]n practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process.").

26

updated Report. *See Deters*, 202 F.3d at 1272 (upholding the maximum-available punitive-damages award because the jury heard evidence "that [the employer] had repeated notice of severe and pervasive sexual harassment" and "offered [the employee] legally indefensible reasons why the harassment should be overlooked"); *Abner v. Kan. City S. R.R. Co.*, 513 F.3d 154, 164–66 (5th Cir. 2008) (upholding a punitive-damages award of $125,000 for eight plaintiffs—with only $1 in nominal damages for each—because the plaintiffs presented extensive evidence of racial slurs and other racially motivated derogatory behavior).

For the ratio guidepost, § 20109 caps punitive damages at $250,000. If the agency awards large punitive damages and small compensatory damages, the ratio between the two forms of damages may well reach double-digits. Indeed, that very thing happened here, with the Board's 21:1 ratio between the $125,000 in punitive damages and the $5,780.52 in back wages. We take special note of this because "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *State Farm*, 538 U.S. at 425. Although we upheld a 59:1 ratio in *Deters*, a case with a statutory cap on punitive (and compensatory) damages, *State Farm*'s later clarification of the ratio guidepost means that we now consider the punitive-to-compensatory-damages ratio differently than we did in *Deters*. But we continue to recognize that, even under *State Farm*, higher ratios may well satisfy due process where "a particularly egregious act has resulted in only a small amount of economic damages." *Id.* (quoting *BMW*, 517 U.S. at 582). Indeed, "there are no rigid benchmarks that a punitive

27

damages award may not surpass." *Haberman v. The Hartford Ins. Grp.*, 443 F.3d 1257, 1272 (10th Cir. 2006).

For the comparable-cases guidepost, we note that Congress has authorized the maximum-available amount of punitive damages in FRSA cases: $250,000. On remand, the Board can consider this statutorily authorized amount as well as its own comparable cases awarding punitive damages in determining what amount of punitive damages are justified.

The Department of Labor asks us to conclude that under the *State Farm* guideposts, the Board's punitive-damages award satisfies due process. BNSF contends that the award does not satisfy due process and cannot survive review under the guideposts, particularly given the double-digit punitive-to-compensatory-damages ratio.

We decline to evaluate the punitive-damages award under the *State Farm* guideposts in the first instance. "[W]hen a reviewing court concludes that an agency invested with broad discretion to fashion remedies has apparently abused that discretion . . . , remand to the agency for reconsideration, and not enlargement of the agency order, is ordinarily the reviewing court's proper course." *N.L.R.B. v. Food Store Emps. Union, Local 347*, 417 U.S. 1, 10 (1974). Indeed, "agencies should be the primary decision makers over matters which Congress has vested in their authority." *Mickeviciute v. I.N.S.*, 327 F.3d 1159, 1164 (10th Cir. 2003); *see I.N.S. v. Ventura*, 537 U.S. 12, 14–17 (2002) (holding that the court of appeals should have remanded the relevant question to the agency rather than decide the question itself).

On remand, the Board should consider whether the punitive-damages award satisfies due process by using both § 20109 and the guideposts.

## CONCLUSION

We deny BNSF's petition for review in part insofar as the petition addresses the FRSA violation and the finding supporting a punitive-damages award. We grant the petition in part regarding the amount and the constitutionality of the punitive-damages award and remand to the Board for further consideration. On remand, the Board should provide a reasoned explanation for the punitive damages it awards and then evaluate that award under the *State Farm* guideposts.