**NONPRECEDENTIAL DISPOSITION**

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted May 21, 2018[*]
Decided May 21, 2018

*Before*

JOEL M. FLAUM, *Circuit Judge*

MICHAEL S. KANNE, *Circuit Judge*

DIANE S. SYKES, *Circuit Judge*

No. 17-2862

| | |
|---|---|
| JACEK SAMSON, | Petition for Review of a Decision of the |
| *Petitioner*, | Administrative Review Board. |
| | |
| *v.* | No. 15-065 |
| | |
| UNITED STATES DEPARTMENT OF LABOR, ADMINISTRATIVE REVIEW BOARD, | |
| *Respondent*, | |
| | |
| *and* | |
| | |
| SOO LINE RAILROAD COMPANY, d/b/a CANADIAN PACIFIC, | |
| *Intervening-Respondent*. | |

---

[*] We have agreed to decide the case without oral argument because the briefs and record adequately present the facts and legal arguments, and oral argument would not significantly aid the court. FED. R. APP. P. 34(a)(2)(C).

**O R D E R**

Canadian Pacific, a railroad company, fired Jacek Samson after he walked off his job as a conductor twice in one week and refused to follow his supervisors' instructions. Samson filed an administrative complaint, alleging that Canadian Pacific required him to work in hazardous conditions and that it fired him because he objected to those conditions, in violation of the Federal Railroad Safety Act, 49 U.S.C. § 20109(b). The U.S. Department of Labor affirmed an administrative law judge's dismissal of the complaint. The ALJ had found that Samson's belief about hazardous conditions was unreasonable and had credited the company's testimony that it fired Samson only because he abandoned his job. Because nothing in the record contradicts the agency's findings, we deny Samson's petition for review.

Both incidents in which Samson walked off the job occurred in early 2013. On February 20, Samson was working with a crew to perform "switches" (disassembling and reassembling trains). Nick Mugavero, a "yardmaster" in charge of all of the crews that day, told Samson to change how he performed a switch. Samson relayed the instruction to his crew. Mugavero then asked Samson about a couple of train cars that he believed were incorrectly labeled. At that point, Samson felt that Mugavero was distracting him and usurping the conductor's authority over the crew. Samson asked Mugavero if *he* was the conductor—implying that Mugavero should back off. Mugavero responded by giving Samson two options: follow his instructions about how to complete the switch, or go home and answer for his conduct in an insubordination hearing. Samson chose the latter option and abandoned his position.

Before he left that day, Samson stopped by the office of the superintendent and filled out a "Safety / Hazard Report." He described his dispute with Mugavero:

> Trainmaster Nick Mugavero came to the east end c-yard and began telling 1399 two men crew how to switch tracks creating unsafe conditions for the crew. He was constantly interfering and causing confusion, crew member insisted on being able to do the switching, Trainmaster Mugavero refused.

The superintendent concluded in a written response that Mugavero's supervision did not constitute a hazardous or unsafe condition.

The second incident occurred two days later. A different yardmaster, Mark Lashbrook, approached Samson at work. Although their accounts of their interaction vary, it is undisputed that Lashbrook told Samson that he must meet the company's

standards for switching a certain number of cars per shift, and that Samson responded by saying that he must "work safely." Lashbrook then remarked that he had just seen Samson complete a switch unsafely. Samson felt pressured by this remark to work faster. He decided to leave his shift early even though Lashbrook and another yardmaster asked him multiple times to stay on duty.

Samson's conduct received several layers of review. Canadian Pacific held two separate disciplinary hearings based on the two incidents. Both hearing officers recommended immediate dismissal, each concluding that by walking off the job on both February 20 and 22, Samson was insubordinate. A multi-level review process at Canadian Pacific commenced, ending with Samson's discharge for his misconduct. Samson then sought administrative review action under the Federal Railroad Safety Act. He alleged that Canadian Pacific fired him in retaliation for refusing to work under unsafe conditions and for reporting a hazardous condition. *See* 49 U.S.C. § 20109(b), (d). An ALJ held a hearing, *see id*. §§ 20109(d)(2)(A); 42121(b)(2)(A), at which Samson, Mugavero, Lashbrook, and other company representatives testified.

After the administrative hearing, the ALJ dismissed Samson's complaint. The ALJ discredited Samson's testimony about his supervisors' motivations and credited the testimony of the company's witnesses. Those witnesses said that Samson's two refusals to follow orders to remain at work—and nothing else—led the company to fire him. Next, the ALJ concluded that Samson's belief that he had to leave work on February 20 and 22 to remain safe was objectively unreasonable. First, although Samson maintained that Mugavero had distracted him on February 20, Samson left his shift *after* the distraction had ended and while he was with his crew in a safe location. Second, Samson's conversation with Lashbrook on February 22 also occurred under safe conditions. Third, Samson acknowledged that neither supervisor's instructions were themselves unsafe, and that both supervisors gave him multiple opportunities to stay at work. Because both refusals to work were unreasonable, the ALJ ruled that neither was protected activity and Samson could be fired for them. Furthermore, the ALJ added, because no objectively hazardous condition was present on February 20, the "Safety / Hazard Report" that Samson filled out that day also was not protected.

Samson has challenged this ruling. He first appealed to the U.S. Department of Labor's Administrative Review Board, which summarily affirmed the ALJ's decision. He now seeks direct review by this court, *see* 49 U.S.C. § 42121(b)(4)(A). As in other administrative contexts, we review the ARB's decision as supplemented by the ALJ's reasoning. *See Orellana-Arias v. Sessions*, 865 F.3d 476, 488–89 (7th Cir. 2017). The

agency's "findings of fact must be upheld if supported by substantial evidence," *Roadway Express, Inc. v. U.S. DOL*, 612 F.3d 660, 664 (7th Cir. 2010), but we review the agency's legal conclusions de novo, giving deference to the reasonable constructions of applicable statutes, *BNSF Ry. Co. v. U.S. DOL*, 816 F.3d 628, 638 (10th Cir. 2016).

The Federal Railroad Safety Act protects railroad employees in two ways that are relevant to this case. The first protection is for reporting safety concerns. An employee may not be fired for "reporting, in good faith, a hazardous safety or security condition." 49 U.S.C. § 20109(b)(1)(A). The second protection is for refusing to work in hazardous conditions, but this protection is more limited. An employee who refuses to work is protected from discharge only if the refusal is made "in good faith" and if a "reasonable individual in the circumstances then confronting the employee" would find (1) that the hazardous condition presented an "imminent danger of death or serious injury" and (2) that "the urgency of the situation" did not "allow sufficient time to eliminate the danger without" refusing to work. *Id*. § 20109(b)(1)(B), (b)(2)(A)–(B). In both cases, the fired employee must show that the protected activity was a contributing factor to the discharge. *See BNSF Ry. Co.*, 816 F.3d at 638.

Samson challenges only the ALJ's conclusion that his "Safety / Hazard Report" was not protected activity—he does not challenge the ALJ's parallel conclusion about his work refusals. Samson contends that the ALJ erroneously applied the heightened requirements for refusals to work under 49 U.S.C. § 20109(b)(2) when deciding if his hazard report was protected activity. The ALJ did indeed recite the standard from § 20109(b)(2), the work-refusal provision, when introducing his analysis of Samson's hazard report. And the ALJ went on to rule that the hazard report was not protected activity for the same reasons that the February 20 work refusal was not protected.

But the ALJ's error of law about the report does not require a remand if the error is harmless. *See Lopez v. Lynch*, 810 F.3d 484, 492 (7th Cir. 2016). And the error is harmless even if the hazard report was protected activity, if it played no role in Samson's firing—that is, if Canadian Pacific fired Samson only for insubordination. *See Armstrong v. BNSF Ry. Co.*, 880 F.3d 377, 382 (7th Cir. 2018) (explaining that retaliation must play "at least some role" in adverse action). Because the ALJ did not decide this question, the *Chenery* doctrine limits our review of it. *See SEC v. Chenery Corp.*, 318 U.S. 80, 87–88 (1943); *Ferreira v. Lynch*, 831 F.3d 803, 809–10 (7th Cir. 2016). Yet *Chenery* does not require a remand if one "would be futile because it is clear what the decision has to be." *Lopez*, 810 F.3d at 492; *see Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010); *Illinois v. ICC*, 722 F.2d 1341, 1348–49 (7th Cir. 1983).

Based on the ALJ's credibility findings, a remand would be futile in this case. The ALJ found credible the company's witnesses who all testified that Samson's refusal to follow his supervisors' instructions, not his filing of the hazard report, led to his firing. The ALJ rejected as not believable Samson's contrary testimony, and Samson presented no other evidence that his hazard report factored into the decision to fire him. Samson challenges the ALJ's credibility findings, but we are required to give "great deference" to such determinations. *Mercier v. U.S. DOL*, 850 F.3d 382, 388 (8th Cir. 2017); *see also Summers v. Berryhill*, 864 F.3d 523, 528 (7th Cir. 2017). Samson also points to the timing of the decision to fire him, but timing alone is not a basis upon which to infer retaliation. *See Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012). Thus even if the ALJ should have ruled that the hazard report *was* protected activity, the ALJ's credibility findings inescapably lead to the conclusion that the report played no role in Samson's firing. So the discharge was lawful, and a remand to the ALJ on that question is thus pointless.

Samson raises another argument, but it is unavailing. He contends that the ALJ should have "sanctioned" Canadian Pacific for not providing him with recordings of radio conversations that he had during the two incidents in question. He says that he asked the ALJ for the recordings during discovery, but Canadian Pacific replied that they did not have them. Samson did not believe the company because Mugavero had testified during the earlier disciplinary hearing that *he* had reviewed them. Thus, Samson argues, the ALJ should have imposed an "adverse inference" against Canadian Pacific. But imposing an adverse inference against a party is left to the discretion of the factfinder. *Bracey v. Grondin*, 712 F.3d 1012, 1019 (7th Cir. 2013). Although Samson brought up the issue of the recordings during his hearing before the ALJ, he did not ask the ALJ to draw an adverse inference. The ALJ did not abuse his discretion by declining to grant relief to Samson that Samson never requested.

Samson's additional arguments lack merit and require no further discussion. Accordingly we DENY his petition for review.